## MARR *v.* WESTERN UNION TELEGRAPH COMPANY.

### (*Nashville.*   March 8th, 1887.)

1pi 529
2pi 393
3pi 190
4pi 326
4pi 430

1. TELEGRAPH COMPANIES. *Negligence in transmission of message. Contract exempting from or limiting liability.*

   A telegraph company is forbidden, on grounds of public policy, to contract for *absolute exemption* from liability for damages resulting from the negligence of its servants or agents in transmitting messages; or even to *limit* the *amount* of its liability for such negligence, by any contract which is not fair, just, and reasonable.

   *Question reserved.* As to right of a telegraph company to *limit* its liability for the negligence of its servants or agents, by *any sort of contract whatever.*

   Cases cited and approved: 27 Iowa, 432; 37 Ohio St., 301; 37 Iowa, 214; 1 Cal., 230; 68 Ga., 299; 60 Ill., 421; 74 Ill., 168; 55 Penn. St., 262; 60 Maine, 9; 78 Penn. St., 238; 34 Wis., 471; 73 Ga., —; 35 Penn. St., 298; 58 Texas, 170; 62 Maine, 209; 58 Ga., 433; 33 Wis., 558; 13 Cal., 422; Dillard *v.* Railroad Co., 2 Lea, 288; Coward *v.* Railroad Co., 16 Lea, 225.

   Cited and disapproved: Grinnell *v.* W. U. Tel. Co., 113 Mass., 299.

   Cited and distinguished: 17 C. B., 3; 15 Mich., 525; 13 Allen (Mass.), 226; 1 Met. (Ky.), 164; 112 U. S., 331.

2. SAME. *Same.   Measure of damages.*

   If, through the negligence of a telegraph company, a message directing the purchase of *one thousand* shares of specified stocks for the sender, is so missent as to read *one hundred* shares, and if, in consequence of such mistake only *one hundred* shares of the designated stocks are purchased, and there is a rise in the market value of such stocks, both *before* and *after* the sender received notice of the mistake; in such case the sender can recover of the company, as damages, only the difference in the cost of nine hundred shares of the specified stocks at the time the one hundred shares were purchased and their cost at such time after notice of the mistake as he could, with due diligence, have secured their purchase.

   Cases cited and approved: 41 N. Y., 544; 44 N. Y., 263.

34

Marr *v.* Western Union Telegraph Company.

3. SAME. *Knowledge by sender, of printed agreement on message blanks, presumed. Estoppel.*

The sender of a message, who writes and signs it on a blank form furnished by the telegraph company for that purpose, is presumed to know and assent to the agreement and regulations printed on such blank form, and is estopped to deny knowledge of the same.

Case cited and approved: Dillard *v.* Railroad Co., 2 Lea, 288.

4. SAME. *Negligence presumed from mistake in transmission of message.*

Where a message delivered to a telegraph company for transmission, as an unrepeated message, is plainly and distinctly written, and such mistake is made in its transmission, that it reaches the connecting company, after passing over only a single line, in a materially altered condition; there is, in the absence of explanation, sufficient evidence of negligence to justify a recovery against the company.

---

### FROM DAVIDSON.

---

Appeal in error from the Circuit Court of Davidson County. FRANK T. REID, J.

T. C. MURRAY for Marr.

J. W. BONNER for Telegraph Company.

LURTON, J. The plaintiff, a banker and broker, doing business in Nashville, delivered to the agent of the defendant company a message to be transmitted to Messrs. Pearl & Co., New York. This message was written upon the usual form or blank prepared for that purpose by the defendant, and known as a night message. As delivered, it was as follows:

Marr *v.* Western Union Telegraph Company.

*Form No. 45.*

## THE WESTERN UNION TELEGRAPH COMPANY.

### NIGHT MESSAGE.

The business of telegraphing is subject to errors and delays, arising from causes which cannot at all times be guarded against, including sometimes negligence of servants and agents whom it is necessary to employ. Errors and delays may be prevented by repetition, for which, during the day, half-price extra is charged in addition to the full tariff rates.

The Western Union Telegraph Company will receive messages, to be sent without repetition during the night, for delivery not earlier than the morning of the next ensuing business day, at reduced rates, but in no case for less than twenty-five cents tolls for a single message, and upon the express condition that the sender will agree that he will not claim damages for errors or delays for non-delivery of such messages, happening from any cause, beyond a sum equal to ten times the amount paid for transmission; and that no claim for damages shall be valid unless presented in writing within thirty days after sending the message.

Messages will be delivered free within the established free delivery limits of the terminal office. For delivery at a greater distance a special charge will be made to cover the cost of such delivery, the sender hereby guaranteeing payment thereof.

The company will be reponsible to the limit of its lines only for messages destined beyond, but will act as the sender's agent to deliver the message to connecting companies or carriers, if desired, without charge and without liability.

THOS. T. ECKERT, *General Manager.*      NORVIN GREEN, *President.*

| *Receiver's No.* | *Time Filed.* | *Check.* |
| --- | --- | --- |
|  |  |  |

*Send the following night message, subject to* } *the above terms, which are hereby agreed to.* } _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _188

*To Pearl & Co., Bankers,* 16 *Broad St., New York:*

Buy *one thousand* shares Memphis and Charleston.

THOS. S. MARR.

☞ Read the notice and agreement at the top.

This message, as received, read as follows: "*Buy one hundred shares of Memphis and Charleston.*" This number of the desired shares—they being, as the proof shows, of the par value of twenty-five dollars each—were purchased at sixty-two cents upon the dollar. The market rose rapidly on the day of this purchase, and closed at about sixty-seven, and remained at about that figure the day following. From that time it steadily advanced,

until within three weeks it had reached the price
of about ninety cents. The plaintiff was not ad-
vised of the error in his message until the day
following the purchase of the one hundred shares,
but he did not renew his order for several days,
by which time the stock had made a further ad-
vance, so that the stock actually cost him about
three thousand dollars more than it would have
cost him but for the error in his message.

Plaintiff instituted suit in the Circuit Court to
recover damages, upon the ground of the negli-
ligence of the defendant in the transmission of
his message.

The cause was tried by the Circuit Judge with-
out a jury, who found that the mistake was due
to the negligence of the agent of the defendant
at the receiving office in Nashville, but that under
the printed regulations of the company contained
on the blank used by plaintiff, he was limited in
his recovery of damages to a sum not exceeding
ten times the price paid for transmission, which
was thirty cents; and he accordingly gave judg-
ment for only three dollars. From this there is
an appeal.

The Commission of Referees report that the stip-
ulations or agreement contained in the printed
blank are invalid in so far as they limit the re-
covery of plaintiff for damages resulting from the
negligence of the defendant or its servants. They
therefore recommend judgment here for the differ-
ence between the market value of nine hundred

shares on the day the message was received and its value on the next day. Exceptions open the case for our consideration.

The evidence shows that this message was written plainly and distinctly. The blunder was undoubtedly the result of the careless and negligent misreading of the dispatch by the operator whose duty it was to transmit this message from the receiving office. The line between Nashville and Cincinnati, the point to which it was sent to be repeated to New York, was a continuous one. The instruments in use at both offices are shown to have been in good repair and the line uninterrupted. No atmospheric or other electrical disturbance is attempted to be shown as having affected the correct transmission of the message, if it had been correctly started. Yet this message reached Cincinnati as "buy *one hundred* shares," etc. The word *"thousand"* had been converted into *"hundred."* No effort to account for this has been made. It is clear in such case that this blunder was made by the transmitting operator at the receiving office. The message was either willfully missent or was the result of the negligent misreading of the operator. If started right, it is not pretended that it would not have reached the repeating office correctly. At least no effort has been made to account for such a noticeable change of one word into another so entirely different, over a continuous line of wire, when the instruments and wire were in repair and efficient,

by any cause not within the control of the defendant.

The trial Judge and the Commission of Referees concur in finding that the mistake was due to negligence of the transmitting operator at Nashville. In this finding we have no doubt they were correct.

What damage shall the plaintiff recover? The defendant company insist that the stipulation upon the face of the blank form used and signed by the plaintiff, "that the sender will not claim damages for errors, or delays, or non-delivery of such message, *happening from any cause,* beyond a sum equal to ten times the amount paid for transmission," is a reasonable and binding agreement by which the recovery is limited, even where the damage was the result of negligence. It must be assumed that the plaintiff knew of the terms and conditions contained upon the printed blank on which he wrote his message. His denial of actual knowledge cannot avail him, for it was his own fault if he is ignorant. He is estopped to say that he was not aware of the agreement and regulations on the blank signed and used by him. *Dillard* v. *Louisville & Nashville Railroad Company,* 2 Lea, 288.

Assuming, therefore, that the plaintiff assented to the conditions contained in the agreement under which this message was sent, we reach the question as to the validity of any agreement by which the defendant company seeks to relieve itself from

full liability for all the consequences of its own negligence or that of its agents and servants. The question presented is of the greatest importance, and in this State is wholly undecided. We have had the benefit of very full and very able arguments from the opposing counsel, and their industry and learning have been of the greatest aid to us in arriving at a conclusion. The science of telegraphy is of such recent discovery that the courts have had some difficulty in settling upon the principles of law applicable to the relations of telegraph companies to the public. Some of the earliest cases held that they were common carriers, and that the principles of law applicable to such carriers applied equally to them; or at least, if not strictly common carriers, that they were governed by the same law. *McAndrew* v. *Electric Telegraph Company*, 17 C. B., 3; *Parks* v. *Alta, California, Telegraph Company*, 13 Cal., 422.

Common carriers by the common law were held liable not only for losses occurring through their negligence, but for loss occurring through any cause other than from the act of God or the public enemy. This extraordinary degree of responsibility, making them liable as insurers, was founded upon public policy. Their existence was of the utmost importance to the public, and when once established the employment of them by the general public was deemed a necessity. The unlimited opportunities offered them by their exclusive possession of freight, by negligence, or collusion,

or fraud, to damage, delay, or rob with practical immunity from detection, is stated to be the reason why considerations of public policy demanded so high a degree of liability. These reasons do not exist in regard to telegraph companies. They are not in any sense carriers of goods. They do not, therefore, have any exclusive possession of goods, and the reasons which make a carrier an insurer of the safe delivery of goods intrusted to him are manifestly not applicable to one whose business it is to transmit, by means of electricity, intelligence, and not goods. It is, therefore, well settled that they are not common carriers by the almost unbroken current of authority. It can hardly be said that they are bailees in any true sense, inasmuch as they are not intrusted with goods for any purpose, either carriage, use, or repair. They have been called common carriers of messages or intelligence; but this, while appropriately designating both their public character and the business they undertake, does not necessarily bring them within the law applicable to a carrier of goods.

There is, however, much analogy between the common carrier and the telegraph company. Both are in the exercise of a *quasi* public occupation, and both have, by the public, conferred upon them valuable franchises, and both may, and do, invoke the high prerogative of exercising the State right of eminent domain.

The obligation to serve the public without dis-

crimination and for reasonable charges is imposed upon both occupations. The use of the facilities afforded by telegraph companies has become as much of a public necessity as were common carriers at the same relative stage of development. It may, indeed, be said that both commercially and socially the telegraph line is now a public necessity. By statute laws in this State, the public nature of the occupation of telegraph companies is fully recognized. They are given the right to set up their lines along the public roads and streets; they may appropriate private property to their use, by the exercise of the right of eminent domain upon the terms of the statute; they are required to give preference to public messages in time of war or civil commotion, or when the arrest of criminals is sought; they are required to transmit messages in the order of delivery *correctly* and without unreasonable delay; they are required to receive and transmit messages from other telegraph companies. The willful injury of their lines is made a misdemeanor. Their occupation is, therefore, in every sense, deemed as much of a public character as is that of the common carrier. Code (M. & V.), §§ 1535 to 1548.

In view, therefore, of the great importance their business is to the public, and the necessity the public is under of employing them, it is clear that they must be held to a degree of diligence commensurate with the employment they have undertaken. We do not think, in view of the novel

and peculiar character of the business conducted by them, that they can or ought to be held liable as insurers. It is, however, equally clear that considerations of public policy demand that they shall be held responsible for a very high degree of diligence. In this State it has been held that a common carrier may, by special contract, based on a sufficient consideration, limit his *common law* liability, but that he cannot stipulate for exemption for the consequences of *his own negligence or that of his servants. Dillard Bros.* v. *Louisville & Nashville Railroad Company,* 2 Lea, 288; *Coward* v. *East Tennessee, Virginia & Georgia Railroad,* 16 Lea, 224.

This inability to contract against his own negligence is based upon the ground that " he exercises a public employment, and that diligence and good faith in the dicharge of his duties are essential to the public interest. And public policy forbids that he should be relieved, by special agreement, from that degree of fidelity and diligence which the law has exacted in the discharge of his duties." *Coward* v. *East Tennessee, Virginia & Georgia Railroad,* 16 Lea, 224.

The same reasons which make void the contracts of a common carrier, by which he seeks to be wholly exempt from the consequences of his own negligence or that of his servants, apply with equal force to similar agreements, contracts, or stipulations, or rules or notices, by which a telegraph company seeks immunity from all responsibility for its negligence. The great weight of the decided cases

clearly establishes this proposition. *Sweatland* v. *Illinois & Mississippi Telegraph Company*, 27 Iowa, 432; *Telegraph Company* v. *Griswold*, 37 Ohio State, 301; *Manville* v. *Telegraph Company*, 37 Iowa, 214; *Graham* v. *Telegraph Company*, 1 Cal., 230; *Blanchard* v. *Telegraph Company*, 68 Ga., 299; *Tyler* v. *Telegraph Company*, 60 Ill., 421, and 74 Ill., 168; *U. S. Telegraph Company* v. *Wenger*, 55 Penn. St., 262; *True* v. *Telegraph Company*, 60 Maine, 9; *Passmore* v. *Telegraph Company*, 78 Penn. St., 238; *Cander* v. *Telegraph Company*, 34 Wis., 471.

But it is insisted that if it be conceded that a telegraph company cannot, by contract, *exempt* itself *absolutely* from *all* liability for negligence, yet that it may, for a sufficient consideration, limit its liability to a certain pecuniary amount, where various grades of liability are offered, including full responsibility, and at various rates of charge. In the case now under consideration the defendant company offer in evidence the terms and conditions upon which they send messages other than the half-rate night message. These stipulations are contained upon the usual blanks furnished for day messages, and are as follows:

Marr *v.* Western Union Telegraph Company.

*Form No. 2.*

### THE WESTERN UNION TELEGRAPH COMPANY.

All messages taken by this company are subject to the following terms:

To guard against mistakes or delays, the sender of a message should order it repeated—that is, telegraphed back to the originating office for comparison. For this, one-half the regular rate is charged in addition. It is agreed between the sender of the following message and this company that said company shall not be liable for mistakes or delays in the transmission or delivery, or for non-delivery, of any unrepeated message, whether happening by negligence of its servants or otherwise, beyond the amount received for sending the same; nor for mistakes or delays in the transmission or delivery, or for non-delivery, of any repeated message beyond fifty times the sum received for sending the same, unless specially insured, nor in any case for delays arising from any unavoidable interruption in the working of its lines, or for errors in cipher or obscure messages. And this company is hereby made the agent of the sender, without liability, to forward any message over the lines of any other company when necessary to reach its destination.

Correctness in the transmission of message to any point on the line of this company can be insured by contract in writing, stating agreed amount of risk, and payment of premium thereon at the following rates, in addition to the usual charge for repeated messages, viz.: one per cent. for any distance not exceeding 1,000 miles, and two per cent. for any greater distance. No employe of the company is authorized to vary the foregoing.

No responsibility regarding messages attaches to this company until the same are presented and accepted at one of its transmitting offices; and if a message is sent to such office by one of the company's messengers, he acts for that purpose as the agent of the sender.

Messages will be delivered free within the established free delivery limits of the terminal office. For delivery at a greater distance, a special charge will be made to cover the cost of such delivery.

The company will not be liable for damages in any case where the claim is not presented, in writing, within sixty days after sending the message.

THOS. T. ECKERT, *General Manager.*      NORVIN GREEN, *President.*

| Receiver's No. | Time Filed. | Check. |
| --- | --- | --- |
|  |  |  |

*Send the following message, subject to the*
*above terms, which are hereby agreed to.* } ------------------------188

*To* ------------------------------------------------

If it be assumed that the plaintiff in this case was offered a choice of terms upon which he might send his message, and that he selected the night message contract by preference, we are then called upon to determine whether the regulations, rules, and stipulations under which this company

propose. to do business for the public are just and reasonable limitations upon the responsibility imposed upon them in the absence of agreements and contracts. The courts of many of the States of this Union have held that a common carrier cannot, by any description of contract, rule, or regulation, limit his responsibility for full damages resulting from his own negligence or that of his servants or agents. *Southern Express Company* v. *Moore*, 39 Miss., 822; *United States Express Company* v. *Bachman*, 28 Ohio State, 144; *Black* v. *Goodrich Transfer Company*, 55 Wis., 319; *Chicago, St. Louis & New Orleans Railroad Company* v. *Ables*, 60 Miss., 1017; *Kansas City Railroad Company* v. *Simpson*, 30 Kansas, 645; *Moulton* v. *St. Paul Railroad Company*, 31 Minn., 85. And this is probably the law as settled in this State. *Coward* v. *East Tennessee, Virginia & Georgia Railroad Company*, 16 Lea, 226.

But, on the other hand, many very respectable courts, including the Supreme Court of the United States, have held that "where a contract of carriage is fairly made with a railroad company, agreeing on a valuation of the property carried, with the rate of freight based on the condition that the carrier assumes liability only to the extent of the agreed valuation, even in case of loss or damage by the negligence of the carrier, the contract will be upheld as a proper and lawful mode of securing a due proportion between the amount for which the carrier may be responsible and the freight he

receives, and of protecting himself against extravagant and fanciful valuations. *Hart* v. *Pennsylvania Railroad Company*, 112 U. S., 331.

In the latter case the Court say that the test to which every limitation of the common law liability of the carrier should be subjected is, "*Its just and reasonable character.*"

If it be assumed—for we do not determine this question—that a telegraph company may, by fair, just, and reasonable regulations, limit the amount of damages to which it may be subjected by reason of negligence, then will the terms and conditions upon which this company propose to conduct its business stand the test of justness and reasonableness? It must at the outset be conceded that a telegraph company, like a common carrier, must offer to do the business of the public, subject to ordinary liability for negligence, upon terms fair and reasonable, and that if it does not do this, it does not offer a choice of terms, and cannot escape full responsibility, even upon the view of the law contained in the case of *Hart* v. *Pennsylvania Railroad Company.*

Now, upon an examination and analysis of the terms contained in both the day and night message blanks of the defendant company, we find:

*First*—That in the usual day message contract they stipulate for immunity from all damages for error or delay in an unrepeated message beyond the price paid for the transmission of the message.

*Second*—If the message be repeated, they contract against liability beyond fifty times the toll paid.

*Third*—They offer to insure the correctness of transmission, except errors in cipher or obscure messages and damages from unavoidable interruption of lines, upon payment of price of a repeated day message and a premium of one per cent. on an agreed amount of risk, if under one thousand miles, and two per cent. if over this. But such insurance must be by a contract in writing.

*Fourth*—They offer to send unrepeated messages at night, for delivery next business day, at half usual day rate, on condition that they shall not be responsible for damages for a sum in excess of ten times the cost of transmission.

Now, to send the message the plaintiff desired to send as a night message, he was required to pay thirty cents. But the defendant contracted against responsibility, even for its own negligence, beyond the sum of three dollars. Looking alone at the printed notices and rules, no proposition is made for repeating such a message. But the agent says that it would have been repeated if he had desired. Of this Marr had no notice whatever. On the contrary, the printed rules and regulations clearly imply that a night message will not be repeated. If he had, instead of sending a night message, sent an ordinary day message, without repeating, then the toll would have been sixty cents; but to do this, he is forced to assent that he shall not be allowed damages for errors committed through

even the negligence of the company a sum in excess of sixty cents—the price of transmission. If he has the message repeated, and pays for this thirty cents more, the defendant still requires that he shall agree to release them from all liability beyond fifty times the toll paid, a sum in itself trivial compared with the injury really sustained by him in this instance.

If he make what defendants call a contract of insurance, he must, in addition to the price of the repeated message—ninety cents—pay a premium of one per cent. upon an agreed amount of risk. The real consequences of an error in sending a commercial dispatch of the character of the one in question would be difficult to estimate in advance. But if an estimate in accord with the very least damage that did in fact occur had been fixed, he would then have had to pay, in addition to the ninety cents, a premium of not less than eleven dollars. If he pays even this exorbitant sum — eleven dollars and ninety cents—he then obtains for that nothing more than an agreement that the company will be responsible for its own acts of negligence to the extent of the agreed amount of risk. The exceptions out of the so-called contract of insurance, leave in substance nothing more than the liability imposed by law for negligence, in the absence of any limitation by agreement.

Now, when we consider that the business of telegraphy is practically a monopoly, and that there is in fact no real competition for the business of

the public, and the other fact that the use of the facilities afforded by such companies has become a matter of social and commercial necessity, we can readily see that the public are under a species of coercion to assent to whatever conditions such companies choose to impose. Practically the scale or graded charges offered by this company afford no real choice of terms. The price at which they propose to send messages subject to ordinary legal liability—the insurance proposition—is so grossly in excess of the cost of service when compared to the terms offered for service without such liability that we do not hesitate to say that the conditions limiting the liability of this company for negligence are not fair, just, or reasonable, and are void as against public policy. They constitute, taken together, but an artful arrangement and device by which the consequences of their own negligence is thrown upon the shoulders of their customers, and they are enabled to conduct business with no responsibility beyond that of the most trivial character for their own want of due care. The terms upon which they do assume full liability are so arranged and so exorbitant as probably never to be called into use. We do not mean to decide that it is not in the power of such a company to graduate their charges in some sort of proportion to the responsibility and risk incurred. We are not insensible to the fact that public policy as much demands that liberty of contract shall be preserved as that unjust and unreasonable limitations shall

be held void. But we do hold that under the printed notices, regulations, and stipulations of this defendant, it did not propose to do the business of the public upon the terms imposed by law—of responsibility for its own negligence or that of its servants—for a reasonable and just compensation, and that, therefore, these limitations contained in the agreement under which this message was sent, under any view of the power of the company to limit its liability for its own negligence, were invalid, in so far as the damage was a result of the negligence of the defendant or its servants.

In reaching this conclusion we have given due consideration to the opinions of the courts of last resort in other States. We have found much conflict upon some of the questions involved in suits of this character. But we have examined all the leading reported cases, and we can in the main concur in the statement of Judge Dillon, who said:

"We have examined all the leading cases known to have been decided with respect to this subject [exemption from liability for negligence], and have not found one holding, when this subject was the exact point in judgment, that the ordinary printed conditions as to repeating messages have the effect to release the company from mistakes caused by its own want of ordinary care." *Sweatland* v. *Illinois & Mississippi Telegraph Company*, 27 Iowa, 432.

The case of *Grinnell* v. *W. U. Telegraph Company*, 113 Mass., 299, is a case decided since the opinion

of Judge Dillon, and is not of course included in his criticism.

The McAndrew case, cited as an authority for the proposition that a telegraph company may contract against its own negligence, and so cited in many subsequent cases, can hardly be regarded as an authority, for it was an English case, and is based upon the English doctrine that a common carrier may contract against his own negligence—a doctrine nowhere sustained in this country except perhaps in the State of New York. *McAndrew* v. *Electric Telegraph Company*, 17 C. B., 3.

The case of *W. U. Telegraph Company* v. *Carew*, 15 Mich., 525, was a case involving no negligence of the company sued. The error occurred on the line of a connecting but independent company, and the Court held that the stipulation that the receiving company should not be responsible for mistakes committed upon other lines was reasonable and valid.

The case of *Ellis* v. *Telegraph Company*, 13 Allen (Mass.), 226, did not involve the fact of negligence, for the Court held that no negligence was proven.

The case of *Camp* v. *W. U. Telegraph Company*, 1 Met. (Ky.), 164, was a suit upon the contract to transmit as contained in the agreement under which the message was sent. The petition did not charge negligence, and consequently the case is not an authority for the proposition that they may contract against negligence.

The conclusions which we have reached as to the effect of stipulations contracting against negligence has the support of text writers of eminence and ability. The distinguished Judge Redfield, in commenting on the McAndrew case before cited, says in this case:

"A query is made, how far the company in such case [exempting itself from liability unless message is repeated] will be responsible for gross negligence. We think there ought to be no doubt in regard to the responsibility of the company in such cases for even ordinary negligence; and the whole extent to which such a condition should be held to qualify the responsibility of the company is, that it will not be held absolutely responsible as an insurer of the accuracy of transmitting messages unless repeated and paid for as such." 2 Red. Railways, 3d Ed., 244.

He repeats the same views in his work on Carriers, Sections 552, 561.

Gray on Telegraphic Communications, a work wholly devoted to the questions concerning telegraphic companies, throws the weight of his opinion against the validity of contracts to any extent limiting liability for negligence as contrary to public policy. Sections 50, 51, and 52, and authorities cited.

We recognize the full force of the reasoning, as well as of the great reputation of the Judge deciding the case of *Grinnell* v. *W. U. Telegraph Company*, 113 Mass., 299; but we cannot concur

with him that these agreements are valid as relieving the company from ordinary negligence. He, however, does not hesitate to doubt whether they could be held as releasing the company from gross negligence or bad faith. This admission is noticeable, for it may well be doubted whether the absence of due care would not be gross negligence. We have already cited, in the earlier part of this opinion, many authorities which to a large degree support the conclusions we have reached. In addition to those already cited, we may refer to the following: *Telegraph Company* v. *Cohen*, 73 Georgia; *Dryburg* v. *Telegraph Company*, 35 Penn. State, 298; *Telegraph Company* v. *Brown*, 58 Texas, 170; *Bartlett* v. *Telegraph Company*, 62 Maine, 209; *Telegraph Company* v. *Fontaine*, 58 Ga., 433; *Hibbard* v. *Telegraph Company*, 33 Wis., 558.

The damages assessed by the Commission of References is upon the correct basis. The loss resulting from change in market value was clearly the natural result of the telegraph operator's mistake. Being the natural result of the negligence of the defendant, the law adjudges that it was within the contemplation of the parties. This message was so written that the slightest reflection would enable the operator who undertook its transmission to see its commercial importance, and put him on his guard against error. The proof shows, however, that if the plaintiff, so soon as he was advised of the miscarriage of his message, and that but one hundred shares of the stock he desired

had been bought instead of one thousand, that he could, by prompt action, have caused the additional nine hundred to have been purchased at sixty-seven cents on the par dollar instead of sixty-two, at which his order could have been filled but for the error. He did not take steps to have this stock bought until the stock had made a much greater advance.

We are of opinion that for the advance occurring after he could have remedied the mistake he cannot hold the defendant responsible. The law imposes upon a party subjected to injury by the action of another the active duty of making reasonable exertions to render the injury as light as possible. Where the injury results from breach of contract or unintentional negligence, this obligation to reduce the consequences of the injury by reasonable diligence is positively imposed by every consideration of public interest and sound morality; " and if the injured party, through negligence or willfulness, allow the damages to be unnecessarily enhanced, the increased loss falls justly on him." *Leonard* v. *New York Telegraph Company*, 41 N. Y., 544; *Rittenhouse* v. *Telegraph Company*, 44 N. Y., 263.

Rendering such judgment as the Circuit Judge should have rendered, we direct judgment to be here entered for eleven hundred and twenty-five dollars, with interest, and for all the costs of the cause. The report of the Commission of Referees is accordingly confirmed.