BAILEY v. WESTERN UNION TELEGRAPH CO. (No. 1340.)†

(Court of Civil Appeals of Texas. Texarkana. Oct. 29, 1914.)

1. COMMERCE (§ 8*)—INTERSTATE COMMERCE—REGULATION BY STATES.

The states have no power to control, beyond their own limits, the conduct of corporations and individuals engaged in interstate commerce, and any legislation to that end is void as creating an unwarranted burden thereon.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 5; Dec. Dig. § 8.*]

2. TELEGRAPHS AND TELEPHONES (§ 27*) — TRANSPORTATION OF INTERSTATE MESSAGES—LIABILITY.

A telegraph company receiving an interstate message in Tennessee for delivery in Texas is liable for damages for mental anguish caused by its failure to deliver the message in Texas.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 80; Dec. Dig. § 27.*]

3. COMMERCE (§ 8*)—TRANSPORTATION OF INTERSTATE MESSAGES—LIABILITY—"COMMON CARRIER."

The amendment June 18, 1910, c. 309, § 1, 36 Stat. 544 (U. S. Comp. St. 1913, § 8563), to Interstate Commerce Act, Feb. 4, 1887, c. 104, § 1, 24 Stat. 379, whereby telegraph companies are made "common carriers" within the act, does not supersede the laws of a state permitting recovery for mental anguish for failure to deliver a message, notwithstanding Carmack Amendment June 29, 1906, c. 3591, § 7, pars. 11 and 12, 34 Stat. 595 (U. S. Comp. St. 1913, § 8592), which applies only to carriers of property transported as freight.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 5; Dec. Dig. § 8.*

For other definitions, see Words and Phrases, First and Second Series, Common Carrier.]

4. TELEGRAPHS AND TELEPHONES (§ 54*) — CONTRACTS FOR TRANSPORTATION AND DELIVERY OF INTERSTATE MESSAGES—STIPULATIONS—VALIDITY—"COMMON CARRIER."

A stipulation, in a contract for the transmission and delivery of an interstate message by a telegraph company, made a common carrier by the act of Congress of 1910, making the Interstate Commerce Act applicable to telegraph companies, that the company shall not be liable for damages beyond $50, at which amount the message is valued, unless a greater value is stated in writing at the time of the offering of the message for transmission and an additional sum paid or agreed to be paid based on such value, is invalid as permitting the company to limit its liability for its negligence in the performance of a duty to the public as a common carrier.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 39–47; Dec. Dig. § 54.*]

5. TELEGRAPHS AND TELEPHONES (§ 54*) — CONTRACTS FOR TRANSMISSION AND DELIVERY OF MESSAGES—LIMITATION OF LIABILITY—VALIDITY.

The stipulation is also void because unreasonable.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 39–47; Dec. Dig. § 54.*]

Appeal from District Court, Bowie County; W. T. Armsted, Special Judge.

Action by T. C. Bailey against the Western Union Telegraph Company. From a judgment granting insufficient relief, plaintiff appeals. Reversed and remanded.

Mahaffey, Thomas & Hughes, of Texarkana, for appellant. Chas. S. Todd, of Texarkana, for appellee.

HODGES, J. The appellant sued the appellee to recover damages resulting from mental anguish suffered by reason of the negligent failure to deliver a death message. On April 13, 1913, R. L. Bailey, the father of the appellant, sent the following message to the appellant at New Boston, Tex., from Bethel Springs, Tenn.: "John at Bethel Springs dangerously sick. Typhoid pneumonia." "John" referred to in the message was the brother of the appellant. He died the next day, and was buried at about 1 o'clock on the 15th. The message reached New Boston, but was never delivered, and the appellant did not know of his brother's illness and death until he received a letter from his father several days after the burial.

After a general denial, the appellee specially pleaded the following provision printed upon the back of the blank on which the message was written:

"Send the following message subject to the terms on back hereof, which are hereby agreed to. * * * In any event the company shall not be liable for damages for any mistakes or delay in the transmission or delivery, or for the non-delivery of this message, whether caused by the negligence of its servants or otherwise, beyond the sum of fifty dollars, at which amount this message is hereby valued, unless a greater value is stated in writing hereon at the time the message is offered to the company for transmission, and an additional sum paid or agreed to be

---

paid, based on such value, equal to one-tenth of one per cent. thereof."

R. L. Bailey, the sender of the message, testified substantially as follows: That he delivered the telegram to the Western Union Telegraph Company at about 8:40 o'clock a. m. on April 13, 1913. He paid the agent $3.65, of which 65 cents was the message fee, and the remainder was for special delivery. At the time the message was tendered to the agent at Bethel Springs, he told the agent that T. C. Bailey, the addressee, lived from four to six miles distant from New Boston in the country; he did not know the exact distance. He also notified the agent of John Bailey's illness and of the relationship to the plaintiff. The appellant testified that he never received the message and knew nothing of his brother's illness and death until some days afterwards, when he received a letter from his father. He lived in the vicinity of New Boston, about five or six miles in the country; had been living there for a number of years; was acquainted with Mr. Roberts, the agent of the telegraph company at New Boston; had been with him in the Masonic Lodge at that place. He further testified that if he had received the message on the 13th of April he would have gone back to Tennessee to see his brother; he was financially able to make the trip, and was familiar with the route.

The appellee offered in evidence the original telegram and the printed provision set out in its answer. It also offered in evidence certain orders made by the Interstate Commerce Commission, which will be referred to later.

At the conclusion of the testimony the court instructed the jury upon the issues of fact involved in the case, and in addition thereto gave the following on the measure of damages:

"Should you find for the plaintiff, you will assess his damages at the sum of $50, which was the value of said message agreed upon and fixed in the contract between the parties when it was given and received for transmission."

The jury returned a verdict in favor of the appellant for the sum of $50. From the judgment entered the plaintiff below has appealed, and assigns as the principal ground for which the case should be reversed the giving of the charge referred to. He contends that the stipulation contained in the printed matter on the back of the telegram blank, which undertakes to limit the liability of the telegraph company to $50, is unreasonable and void.

This being an interstate message, the first question to be decided is: Was mental anguish a proper element of damages to be considered by the jury? If it was not, then the question as to the validity of the stipulation limiting the amount of the recovery to $50 is of no importance, and the judgment of the court below should be affirmed on the ground that no other damages were proven.

[1] In his oral argument, counsel for the appellee called attention to the case of W. U. Tel. Co. v. Brown, 234 U. S. 542, 34 Sup. Ct. 955, 58 L. Ed. 1457. In that case the message was sent from a point in South Carolina, addressed to Wm. Brown in Washington, D. C. It was forwarded to Washington without delay, but through the negligence of the agents of the telegraph company in Washington was not delivered. The message read as follows: "Come at once. Your sister died this morning." Brown subsequently filed suit in the court of common pleas in the state of South Carolina and recovered a judgment for damages based upon mental anguish. That judgment was affirmed by the state Supreme Court, and a writ of error prosecuted to the Supreme Court of the United States, where the case was reversed upon grounds heretofore stated. From the facts set out in the opinion it appears that the suit was based upon the statute of South Carolina which provided that damages for mental anguish were recoverable in such cases. It also appears that under the ruling of the courts of the District of Columbia mental anguish was not regarded as a proper element of damage in such suits. Justice Holmes, who rendered the opinion in the Brown Case, held that the action was one of tort; that, the misconduct having occurred in the District of Columbia, the question of liability must be determined by the laws of that place. Upon that proposition he said:

"Whatever variations of opinion and practice there may have been, it is established as the law of this court that, when a person recovers in one jurisdiction for a tort committed in another, he does so on the ground of an obligation incurred at the place of the tort that accompanies the person of the defendant elsewhere, and that is not only the ground but the measure of the maximum recovery."

After quoting several authorities, he continues:

"The injustice of imposing a greater liability than that created by the law governing the conduct of the parties at the time of the act or omission complained of is obvious; and when a state attempts in this manner to affect conduct outside its jurisdiction or the consequences of such conduct, and to infringe upon the power of the United States, it must fail."

Inasmuch as damages based upon mental anguish are recoverable both by the laws of Tennessee and of Texas, that particular ground for reversing the judgment does not exist in this case. But upon another proposition he uses this language:

"What we have said is enough to dispose of the case, but the act (referring to the statute of South Carolina) also is objectionable in its aspect of an attempt to regulate commerce among the states. That is, as construed, it attempts to determine the conduct required of the telegraph company in transmitting a message from one state to another or to this district by determining the consequences of not pursuing such conduct, and in that way encounters W. U. Tel. Co. v. Pendleton, 122 U. S. 347 [7 Sup. Ct. 1126], 30 L. Ed. 1187, 1 Interst. Com. R. 306, a decision in no way qualified by W. U. Tel. Co. v. Commercial Milling Co., 218 U. S. 406, 31

Sup. Ct. 59, 54 L. Ed. 1088 [36 L. R. A. (N. S.) 220, 21 Ann. Cas. 815]."

Counsel for the appellee contends that this last quotation is an unequivocal holding that mental anguish is not a proper element of damages to be considered in any suit involving an interstate message, for the reason that to do so would be to impose a burden on interstate commerce.

In the case of W. U. Tel. Co. v. Compton, 169 S. W. 946, the Supreme Court of the state of Arkansas took that view, and upon that ground alone granted a rehearing, reversed and remanded a case which had been previously affirmed by it. If Justice Holmes intended to announce a ruling so far reaching in its effects as that contended for, the language he employed in connection with the cases to which he referred left the matter in some doubt, at least. Until there is some clear and unequivocal declaration of such a doctrine by the federal Supreme Court, we do not feel justified in departing from the rule so long recognized by the state courts. The facts of this case are in some material respects different from those of the Brown Case. Here the misconduct, or tort, occurred in the state of the forum, and the effort is to apply those laws in measuring the liability of the wrongdoer. There the action was instituted in a state where the tort had not occurred, and the liability of the wrongdoer was determined by the laws of the forum, which were different from those of the place where the wrong was committed. This was an attempt to enforce the South Carolina statute beyond the limits of that state and bring it into conflict with the laws of the District of Columbia. We are strongly inclined to believe that this is what Justice Holmes referred to when he used the language quoted. This is made more apparent by an examination of the Pendleton Case, to which he refers as supporting the ruling made. That was a suit by Pendleton against the Western Union Telegraph Company to recover a penalty of $100 prescribed by a statute of Indiana for failing to deliver at Ottumwa, Iowa, a message received in Indiana for transmission to that place. The statute required telegraph companies, on payment or tender of the usual charge, to transmit messages with impartiality and good faith and in the order of time in which they were received, under penalty, in case of failure to transmit, or if postponed out of such order, of $100 to be recovered by the person whose dispatch was neglected or postponed. It contained also this additional proviso:

"That arrangements may be made with the publishers of newspapers for the transmission of intelligence of general and public interest out of its order, and that communications for and from officers of justice shall take precedence of all others."

Justice Field, who rendered the opinion of the court in that case, held that these provisions exceeded the authority of the state in so far as they applied to interstate messages. He said:

"The object of vesting the power to regulate commerce in Congress was to secure, with reference to its subjects, uniform regulations, where such uniformity is practicable, against conflicting state legislation. Such conflicting legislation would inevitably follow with reference to telegraphic communications between citizens of different states *if each state was vested with power to control them beyond its own limits.* (Italics ours.) The manner and order of the delivery of telegrams, as well as of their transmission, would vary according to the judgment of each state. Indiana, as seen by its law given above, has provided that communications for or from officers of justice shall take precedence, and that arrangements may be made with publishers of newspapers for the transmission of intelligence of general and public interest out of its order; but that all other messages shall be transmitted in the order in which they are received; and punishes as an offense a disregard of this rule. Her attempt, by penal statutes, to enforce a delivery of such messages in other states, in conformity with this rule, could hardly fail to lead to collision with their statutes. Other states might well direct that telegrams on many other subjects should have precedence in delivery within their limits over some of these, such as telegrams for the attendance of physicians and surgeons in case of sudden sickness or accident, telegrams calling for aid in cases of fire or other calamity, and telegrams respecting the sickness or death of relatives."

There, as in the Brown Case, an effort was made to give extraterritorial effect to a state statute. No doctrine, probably, is better settled by the decisions of the Supreme Court of the United States than that the states have no power to control beyond their own limits the conduct of corporations and individuals engaged in interstate commerce. Such legislation has uniformly been held to be void as creating unwarranted burdens on that species of commerce. It was that character of legislation which was condemned in the Pendleton Case, and we think Justice Holmes was applying the same rule to a similar state of facts when he used the language last quoted. To give that language a different application would make that decision repugnant to the oft-approved case of W. U. Tel. Co. v. James, 166 U. S. 650, 16 Sup. Ct. 934, 40 L. Ed. 1105.

In the last-mentioned case, David W. James sued the telegraph company in the state courts of Georgia to recover the sum of $100 as a penalty for the failure of the company to promptly deliver a telegraphic message addressed to him at his residence in Blakely in the state of Georgia. The message was sent from Eufaula in the state of Alabama. The only question before the court was whether the statute of the state of Georgia providing for the recovery of such a penalty was a valid exercise of the power of the state in relation to messages by telegraph sent from points outside to some point within the state of Georgia. The validity of that statute was upheld upon the ground that it was but a proper exercise of the police power of the state, in the absence of any opposing congressional legislation on that subject.

In W. U. Tel. Co. v. Commercial Milling Co., referred to by Justice Holmes in the Brown Case, the court had a similar question under consideration; and, after quoting from numerous authorities, the same principle was announced. Both the James and the Pendleton Cases are referred to and harmonized. Of the James Case it is said:

"A statute of Georgia which required telegraph companies having wires wholly or partly within the state to receive despatches, transmit, and deliver them with due diligence under the penalty of $100, was sustained as a valid exercise of the power of the state in relation to messages by telegraph from points outside of and directed to some point within the state. It will be observed that this case in some particulars exhibits a contrast to Western U. Teleg. Co. v. Pendleton, and yet they are entirely reconcilable, having a common principle. In the latter case the law passed on clearly transcended the power of the state, because it directly regulated interstate commerce, as we have already shown. In the James Case the power of the state was exercised in aid of commerce. In the latter case prior cases were reviewed, and the principle determining the validity of the respective statutes was declared to be whether they could be 'fully carried out and obeyed without in any manner affecting the conduct of the company with regard to the performance of its duties in other states.' It was said that a statute of that kind, as it would 'not unfavorably affect or embarrass' the telegraph company, in the course of its employment, should be held valid 'until Congress speaks upon the subject.'"

Referring to the facts of the case then being considered, the court continued:

"The telegraph company in the case at bar surely owed the obligation to the milling company to not only transmit the message, but to deliver it. For the failure of the latter it sought to limit its responsibility, to make the measure of its default not the full and natural consequence of the breach of its obligation, but the mere price of the service, relieving itself, to some extent, even from the performance of its duty; a duty, we may say, if performed or omitted, may have consequence beyond the damage in the particular instance. This the statute of the state, expressing the policy of the state, declares shall not be. For the reasons stated, we think that this may be done, and that it is not an illegal interference with interstate commerce."

[2] If a state may by statute impose a penalty on interstate carriers for their failure to perform within its limits their common-law duties, it may with equal propriety make mental anguish an element of damages for such misconduct committed within those limits. The principle upon which this proposition rests would be the same whether mental anguish was made recoverable by virtue of a statutory enactment or was founded upon a rule of common-law construction adopted by the state courts. It is urged, however, that since the rendition of the decisions referred to Congress has entered and covered that particular field of legislation, and that the rules there announced are no longer applicable.

[3] In 1910 the Interstate Commerce Law was amended, and telegraph companies doing an interstate business were made subject to its provisions so far as the same were applicable. The material portions of the enactment relating to this subject are contained in section 1 of the Interstate Commerce Law, and are as follows:

"Sec. 1. That the provisions of this act shall apply to any corporation or any person or persons engaged in the transportatoin of oil or other commodities except water and except natural or artificial gas, by means of pipe lines, or partly by pipe lines and partly by railroad, or partly by pipe lines and partly by water, and to telegraph, telephone, and cable companies (whether wire or wireless) engaged in sending messages from one state, territory, or district of the United States, to any other state, territory, or district of the United States, or to any foreign country, who shall be considered and held to be common carriers within the meaning and purpose of this act. * * * All charges made for any service rendered or to be rendered in the transportation of passengers or property and for the transmission of messages by telegraph, telephone, or cable, as aforesaid, or in connection therewith, shall be just and reasonable; and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful: provided, that messages by telegraph, telephone, or cable, subject to the provisions of this act, may be classified into day, night, repeated, unrepeated, letter, commercial, press, government, and such other classes as are just and reasonable, and different rates may be charged for the different classes of messages."

See U. S. Compiled Stat. 1913, § 8563.

It appears from these extracts that the extent to which Congress has gone is merely to declare that telegraph companies shall be considered common carriers, and to require them to make and observe reasonable rates and charges for the services which they perform, and to permit them to divide their messages into classes, presumably as a basis for rates. The mere fact that Congress has enacted some legislation on this subject does not of itself signify a purpose to monopolize the field and exclude the states entirely. M., K. & T. Ry. Co. v. Harris, 234 U. S. 412, 34 Sup. Ct. 790, 58 L. Ed. 1377; Atl. C. L. Ry. Co. v. State of Georgia, 234 U. S. 280, 34 Sup. Ct. 829, 58 L. Ed. 1312.

After the adoption of the amendment referred to above, the Interstate Commerce Commission promulgated the following orders:

"(1) Each and every telegraph and telephone company which transmits messages over its line, or lines, from a point in one state, territory, or district of the United States to any other state, territory, or district of the United States, or to any foreign country, is subject to the provisions of the act.

"(2) If a telegraph or telephone company, the line of which is wholly within a single state, or territory, or district of the United States, receives a message within such state, territory, or district of the United States, for transmission to a point without the state, territory, or district of the United States, which it transmits over its line to another point in the same state, territory, or district of the United States and there delivers it to an interstate line for transmission to destination, the first-named company by virtue of its participation in this transaction, is not made subject to the provisions of the act; unless there be an arrangement between that company and its connection for through continuous transmission of such message, in which latter case all of the participating compa-

nies in such through continuous transmission are subject to the provisions of the act.

"(3) If two or more lines are connected so that a person within one state, territory, or district of the United States talks with a person at a point without such state, territory, or district of the United States, or so that a message is transmitted directly from a point within a state, territory, or district of the United States to a point without the same, the transmission or message in this manner constitutes commerce and brings all of the participating lines within the purview of the act.

"(4) It follows that telegraph and telephone companies subject to the act, as above indicated, must conform to the provisions of section 1 thereof requiring that all their rates and charges for the transmission of interstate messages shall be reasonable and just, and that such companies may lawfully issue franks covering free interstate service or may grant free interstate service to the same extent, and subject to the same limitations as other common carriers under the provisions of said section.

"(5) Such telegraph and telephone companies subject to the act are also governed by the provisions of section 3 forbidding any undue or unreasonable preference or advantage by rebates or otherwise, or any undue or unreasonable prejudice or disadvantage in any respect whatsoever, and are subject to the lawful orders of the commission made pursuant to the provisions of section 15 of the act, and also of section 20 thereof respecting the keeping of accounts and memoranda and the making of reports to the commission.

"The commission at this time withholds expression of its views regarding other questions which have arisen with respect to the amenability of these carriers to the provisions of other sections of the act."

In the case of M., K. & T. Ry. Co. v. Harris, 234 U. S. 412, 34 Sup. Ct. 790, 58 L. Ed. 1377, the Supreme Court of the United States had under consideration a provision of a Texas statute allowing the recovery of $20 as attorney's fees for the collection of claims not exceeding $200 against railroads. It was there contended that in its application to the collection of claims based upon interstate shipments this statute was void for the reason that the state had no authority to legislate upon that subject; Congress having enacted laws regulating that species of interstate commerce. After quoting numerous decisions, Justice Pitney, in rendering the opinion, said:

"These cases recognize the established rule that a state law enacted under any of the reserve powers—especially if under the police power—is not to be set aside as inconsistent with an act of Congress, unless there is actual repugnancy, or unless Congress has, at least, manifested a purpose to exercise its paramount authority over the subject. The rule rests upon fundamental grounds that should not be disregarded."

Continuing, and quoting from a decision rendered by Justice Harland in Reid v. Colorado, 187 U. S. 137, 23 Sup. Ct. 92, 47 L. Ed. 108, he says:

" 'It should never be held that Congress intends to supersede or by its legislation suspend the exercise of the police powers of the states, even when it may do so, unless its purpose to effect that result is clearly manifested. This court has said—and the principle has been often reaffirmed—that, in the application of this principle of supremacy of an act of Congress in a case where the state law is but the exercise of a reserve power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together.' "

To the same effect is At. C. L. Ry. Co. v. State of Georgia, 234 U. S. 280, 34 Sup. Ct. 829, 58 L. Ed. 1312.

Applying the test here laid down, would there be any repugnancy between these congressional provisions and those of a state law permitting the recovery of a penalty, or damages for mental anguish, for a failure to deliver a message? We fail to discover any. The question is not one relating to rates or the classification of messages, but to liability for negligence. Neither do we think that by the passage of the law quoted Congress has "clearly manifested" a purpose to supersede or suspend the exercise of the police powers of the states with reference to this particular subject. The only provision of the Interstate Commerce Act to which we are referred as evidence of the fact that Congress has undertaken to legislate upon this is what is commonly referred to as the Carmack Amendment. We quote so much of that provision as is claimed to be applicable:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed."

This provision evidently applies only to carriers of property transported as freight. It was made a part of the Interstate Commerce Act some time previous to the adoption of the amendment making that act applicable to telegraph and telephone companies, and at a time when carriers of passengers and freight were the only transportation companies sought to be regulated by that act.

In Smith v. Alabama, 124 U. S. 465, 8 Sup. Ct. 564, 31 L. Ed. 508, Justice Mathews, in rendering the opinion of the court, says:

"A carrier exercising his calling within a particular state, although engaged in the business of interstate commerce, is answerable according to the laws of the state for acts of nonfeasance or misfeasance committed within its limits. If he failed to deliver goods to the proper consignee at the right time or place, he is liable in an action for damages under the laws of the state in its courts; or, if by negligence in transportation he inflicts injury upon the person of a passenger brought from another state, a right of action for the consequent damage is given by the local law. In neither case would it be a defense that the law gives the right to redress those wrongs as being an unconstitutional regulation of commerce by the state."

Our conclusion is that in using the language he did in the latter portion of the opinion in the Brown Case Justice Holmes merely intended to reiterate the rule announced in the Pendleton Case and apply it to a similar state of facts.

[4] Turning, then, to the consideration of the next question: Did the appellee have the right to limit the extent of its liability for its negligence in failing to deliver the telegram in the manner attempted in this instance? While this identical question has never been passed on by any of the courts of last resort, so far as we have been able to find, similar provisions have been held unreasonable and void by the Supreme Courts of both Texas and Tennessee. Marr v. W. U. Tel. Co., 85 Tenn. 529, 3 S. W. 496; W. U. Tel. Co. v. Rosentreter, 80 Tex. 416, 16 S. W. 25; W. U. Tel. Co. v. Neill, 57 Tex. 283, 44 Am. Rep. 589.

Counsel for the appellee contends that, since the amendment of the Interstate Commerce Act making telegraph companies subject to its provisions, the conditions expressed in the printed blanks of the company and the rates specified have become the lawful rates based upon those conditions and stipulations. The only evidence offered in the trial below of any established classification of messages for the purpose of fixing rates as permitted under the acts of Congress was that of the agent at New Boston before referred to.

It appears from orders made by the Interstate Commerce Commission that no ruling has yet been made by that body determining whether or not those provisions of the Interstate Commerce Act requiring carriers to file with the commission a tariff of rates and charges apply to telegraph companies. The wording of section 6, where this provision is found, warrants the inference that Congress had no such intention; and the fact that the commission, when called upon to pass upon the applicability of other sections, expressed no opinion as to that section, strongly indicates the same view. In any event, there is before us no evidence that the appellee has ever filed with the commission any classification of messages or system of rates. We must therefore assume that the classification of rates now in use is that which the company has adopted and is observing without the formal approval of the Interstate Commerce Commission.

But the question before us is, not whether the rate stipulated in this instance was unjust or unreasonable, but was the limitation which it sought to ingraft a valid exercise of its right of contract? Considering the printed matter contained in those telegraph blanks as parts of a contract between the sender and the telegraph company regarding the particular service undertaken, the conditions under which it is to be performed, and fixing the maximum amount of damages recoverable in the event of failure to deliver the message within the proper time, is such a contract valid and enforceable? Aside from the question as to whether or not the stipulation is reasonable or may be enforced against the addressee of this message, we think it is subject to the objection that it is an effort on the part of the telegraph company to limit its liability for its own negligence and that of its servants. Congress has definitely fixed the legal status of telegraph companies engaged in interstate commerce by declaring them to be common carriers, thereby making them subject to the same restrictions upon the right of contract that applies to other common carriers. It is their common-law duty to receive, transmit, and deliver messages with impartiality, in good faith, and with due diligence. This obligation grows out of their relation to the public, and for a failure to perform it they are responsible in damages to the injured party—whether it be the sender of the message or the addressee. Negligence is ordinarily, as in this case, the basis of their liability. Any agreement, stipulation, or condition in the terms upon which a message is received for transmission, which in effect relieves the company from liability for the full measure of the damages inflicted by the negligent failure to discharge its duty, is within the legal inhibition. It is not necessary that the agreement or stipulations, in order to be subject to this objection, provide for entire immunity from the consequences of such misconduct. It is sufficient if they provide for only a partial exemption. Nor does it matter that the agreement is founded upon a consideration. K. C. S. Ry. Co. v. Carl, 227 U. S. 639, 33 Sup. Ct. 391, 57 L. Ed. 683. If it be true that the evidence in this case justified a finding by the jury that the appellee was guilty of negligence in failing to deliver the message to the appellant, and that by reason thereof he sustained damages in excess of the sum of $50, the only defense interposed against a full recovery is the alleged contract stipulating that in just such a contingency that sum is the maximum that may be recovered. It is insisted, however, that a legitimate exercise of the freedom of contract permits telegraph companies to adjust their rates according to the risk assumed, and that this right involves the collateral right of graduating their charges with reference to the maximum of liability that may be incurred. In support of that contention we are referred to the following line of cases: Adams Express Co. v. Croninger, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257; M., K. & T. Ry. Co. v. Harriman, 227 U. S. 657, 33 Sup. Ct. 397, 57 L. Ed. 690; K. C. S. Ry. Co. v. Carl, 227 U. S. 639, 33 Sup. Ct. 391, 57 L. Ed. 683. To which the following might be added as reiterating the same rule: G. N. Ry. Co. v. O'Connor, 232 U. S. 508, 34 Sup. Ct. 381, 58 L. Ed. 703.

In the Croninger Case the Supreme Court had under consideration a clause in a receipt issued by an express company stipulating that the value of the property was fixed at $100, and providing that this sum should be the measure of the express company's liability in case of loss. It was held that this was a valid stipulation. The other cases

cited involved similar provisions in bills of lading issued by railway companies. In the Carl Case the railway company had issued a bill of lading in which the value of the property was stipulated, and it was agreed that the carrier should not be liable in case of loss for the value of such property beyond the sum fixed. The question as to whether or not such contracts were contracts against negligence was referred to, and Justice Lurton, who rendered the opinion of the court, said:

"Is the contract here involved one for exemption from liability for negligence and therefore forbidden? An agreement to release such a carrier for a part of a loss due to negligence is no more valid than one whereby there is complete exemption. Neither is such a contract any more valid because it rests upon a consideration than if it was without consideration. A declared value by the shipper for the purpose of determining the applicable rate, when the rates are based upon valuation, is not an exemption from any part of its statutory or common law liability. The right of the carrier to base rates upon value has been always regarded as just and reasonable."

Continuing he quotes with approval the following from Hart v. Railway Co., 112 U. S. 331, 5 Sup. Ct. 151, 28 L. Ed. 717:

" 'The distinct ground of our decision in the case at bar is, that where a contract of the kind, signed by the shipper, is fairly made, agreeing on the valuation of the property carried, with the rate of freight based on the condition that the carrier assumes liability only to the extent of the agreed valuation, even in case of loss or damage by the negligence of the carrier, the contract will be upheld as a proper and lawful mode of securing a due proportion between the amount for which the carrier may be responsible and the freight he receives, and of protecting himself against extravagant and fanciful valuations.' The valuation declared or agreed upon, as evidenced by the contract of shipment upon which the published tariff rate is applied, must be conclusive in an action to recover for loss or damage a greater sum. In saying this we lay on one side, as not here involved every question which might arise when it is shown that the carrier intentionally connived with the shipper to give him an illegal rate, thereby causing a discrimination or preference forbidden by the positive terms of the act of Congress and made punishable as a crime. To permit such a declared valuation to be overthrown by evidence aliunde the contract, for the purpose of enabling the shipper to obtain a recovery in a suit for loss or damage in excess of the maximum valuation thus fixed, would both encourage and reward undervaluations and bring about preferences and discriminations forbidden by the law. Such a result would neither be just nor conducive to sound morals or wise policies. The valuation the shipper declares determines the legal rate. Where there are two rates based upon valuation, he must take notice of the rate applicable. An actual want of knowledge is no excuse."

In the Harriman Case the same judge said:

"The ground upon which the shipper is limited to the valuation declared is that of estoppel, and presupposes that valuation to be one made for the purpose of applying the lower of two rates, based upon the value of the cattle."

Again he says:

"When the carrier graduates its rates by value and has filed its tariffs showing two rates applicable to a particular commodity or class of articles, based upon a difference in valuation, the shipper must take notice, for the valuation automatically determines which of the rates is the lawful rate. If he knowingly declares an undervaluation for the purpose of obtaining the lower of two published rates, he thereby obtains an advantage and causes a discrimination forbidden and made unlawful by the first section of the Elkin Act of February 19, 1903 (U. S. Comp. St. 1913, § 8597)."

These decisions, we think, make it clear that in sustaining the right of the carrier to invoke the limitations based upon an agreed valuation of the property received for shipment there was no recognition of a right to limit ultimate liability to less than the actual value of the property, but merely the announcement of a rule of public policy which estops the shipper from denying the truth of the fact which he has solemnly stated for the purpose of obtaining the service of the carrier. He will not be permitted to value his property at one sum for the purpose of shipment when it enables him to secure a reduction in the freight rate, and at a higher sum when he seeks to recover damages for its loss. The law contemplates that the receipt or bill of lading, when issued and accepted by the shipper, shall state the true value of his property; and in order to circumvent the perpetration of a wrong both against the carrier and the public, in a suit for damages for the loss of the property, it conclusively presumes such is the case. It is true that, when the shipper undervalues his property in the bill of lading and is held to that valuation in case of loss resulting from the negligence of the carrier, the latter does by virtue of that stipulation secure partial immunity from liability for its negligence. But such consequences are only incidental, and are not contemplated as the primary object of the contract. They occur only when the shipper has in the first instance made a false statement. There is an obvious distinction between the stipulations sustained in the cases referred to and those here under consideration. There the contracts merely attempted to fix the value of the property to be transported, which does not in itself measure the limit of liability in the event of loss or damage. It not infrequently happens that there are other and special damages which far exceed the value of the property and which may be considered in determining the full amount of the ultimate recovery. Such damages were not controlled or attempted to be controlled by the receipts and bills of lading involved in the cases cited. Telegraph companies not being required to file their rates with the Interstate Commerce Commission for its approval, the appellee is not in a position to claim that its rates have been established by law and that to allow the appellant to claim a sum in excess of $50 would be according him an illegal advantage over other patrons of the company. Neither is it in a position to invoke an estoppel against the appellant, as was done in the railway and

express cases cited. There the shipper in legal effect declared a fact to be true, and upon that declaration legal rates and liabilities were adjusted. Here there is no statement of a fact. The valuation of the message can be regarded as nothing more than a pledge that no more than the sum named will be claimed as damages in the event the message is negligently delayed or not delivered. This at most is but a covenant on the part of the sender, and not the statement of a fact. The liability of telegraph companies is always limited to such damages as might reasonably be expected to result from the conditions and relations of which they have notice. That rule relieves such companies from consequences resulting from conditions of which they are ignorant or about which they have been misled. To give effect to the stipulations here relied on would be permitting the appellee, through the medium of a low rate, if such a rate be lower than that commonly charged for death messages between the same points, to purchase immunity from the consequences of misconduct amounting to a tort. We therefore conclude that the stipulation is void and should have been so held by the trial court. The same conclusion was reached by the Supreme Court of Arkansas in W. U. Tel. Co. v. Compton, 169 S. W. 946, recently decided. That case, however, as before stated, was reversed upon other grounds.

[5] We are further of the opinion that the stipulation here under consideration is void because it is unreasonable. Telegraph companies are agencies for the rapid transmission of messages in emergencies which do not permit the slow process of the mails. Such companies are frequently employed as means of communication between utter strangers who know nothing of each other's situations or surroundings. To require the sender of an important telegraphic message, under such circumstances, to value the contract, or, in other words, to fix the limitation of damages that should be recoverable by any of the parties interested on account of the failure of the company to perform its duty, would be to demand that such a party enter upon the most uncertain of speculations. To even require him, as a condition to the acceptance of the message, to fix a limitation upon his own claim, would be little less absurd and unreasonable. The public have a right to demand the carriage of messages without any such limitation whatever. Yet in the printed stipulations on the message offered in evidence as a sample of the regulations which have been adopted by the appellee no such option is given to the public. Unless the sender in every instance fixes some value or limitation upon his future claim for damages, the company reserves the right to fix it for itself at a sum not exceeding $50. This is an arbitrary denial of a right of which the public cannot be deprived in such a manner.

The judgment is reversed and the case remanded.