WESTERN UNION TELEGRAPH CO. v.
PIPER. (No. 8337.)

(Court of Civil Appeals of Texas. Ft. Worth.
Dec. 16, 1916. Rehearing Denied
Jan. 20, 1917.)

1. TELEGRAPHS AND TELEPHONES ☞54(5)—
NEGLIGENCE—REPEATED MESSAGE.

Repetition of a telegraph message, at the instance of the addressee, inured to the benefit of the sender, to bring him within the company's stipulation that it would be liable in excess of a certain amount only if the message were repeated.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 43, 46; Dec. Dig. ☞54(5).]

2. COMMERCE ☞10—INTERSTATE COMMERCE—POWER OF STATE.

The mere fact that federal Const. art. 1, § 8, commits to Congress the power of regulating commerce among the several states, and that Congress passed the Interstate Commerce Act in 1887 (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1913, § 8563 et seq.]) and provided for the establishment of the Interstate Commerce Commission, with supervisory power over the subject, will not alone deprive the several states of the power of enforcing their own rules and public policy over the subject of Interstate Commerce, when not in conflict with some congressional enactment.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 8; Dec. Dig. ☞10.]

3. COMMERCE ☞8(1)—EXERCISE OF FEDERAL CONTROL — TERMINATION OF POWER OF STATES.

Where Congress once assumes control over a subject or territory committed to it by the Constitution of the United States, all power of the separate states over such subject is at an end.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 5; Dec. Dig. ☞8(1).]

4. COMMERCE ☞8(7) — LIABILITY OF TELEGRAPH COMPANY — INTERSTATE COMMERCE ACT.

By the enactment of June 18, 1910 (Act June 18, 1910, c. 309, 36 Stat. 544 [U. S. Comp. St. 1913, § 8563]), amending the Interstate Commerce Act so as to classify telegraph companies as common carriers, subject to the Interstate Commerce Laws, Congress did not intend to subject such companies to the operation of the wholly inapplicable regulations originally designed to govern an altogether different character of carrier, so that the rules of decision of the state have application to determine the liability of a telegraph company for negligence in transmission of interstate message.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. ☞8(7).]

5. COMMERCE ☞8(7)—INTERSTATE COMMERCE ACT—EFFECT.

The amendment of June 18, 1910, to the Interstate Commerce Act, classifying telegraph companies as common carriers subject to the interstate commerce laws, subjected telegraph companies to the regulations of Congress that could be appropriately applied to them and to their character of business.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. ☞8(7).]

6. TELEGRAPHS AND TELEPHONES ☞33(1)—LIMITATION ON LIABILITY—BINDING FORCE UNDER INTERSTATE COMMERCE LAW.

Under the amendment (Act June 29, 1906, c. 3591, § 2, 34 Stat. 586 [U. S. Comp. St. 1913, § 8569]) to Interstate Commerce Act, § 6, providing that a common carrier subject to the act shall file with the commission and print and keep open to public inspection schedules showing all rates, fares, and charges, which shall plainly state any rules or regulations which in any wise change, affect, or determine any part of the aggregate of such rates, fares, and charges, or the value of the services rendered, a telegraph company cannot assert the validity and binding force of its rate or regulation under the interstate commerce law when it has not complied with the plain requirement of such law by filing its rates and regulations with the Interstate Commerce Commission.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21; Dec. Dig. ☞33(1).]

7. TELEGRAPHS AND TELEPHONES ☞33(1)—PUBLISHING AND POSTING RATES AND REGULATIONS.

By the Interstate Commerce Act, requiring that interstate carriers publish and post in conspicuous places their rates and regulations, Congress intended that the sender of a telegraph message have open notice of all rates or regulations, in addition to that implied by law from the mere fact of sending a telegram which bears printed terms on its back.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21; Dec. Dig. ☞33(1).]

8. CARRIERS ☞150 — CONTRACTING AGAINST NEGLIGENCE.

The common-law doctrine that a carrier will not be permitted to relieve himself from the consequences of negligence on his part, or on the part of his servants or employés, is generally upheld by the federal and state courts.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 654–659; Dec. Dig. ☞150.]

Appeal from District Court, Tarrant County; Marain H. Brown, Judge.

Suit by C. W. Piper against the Western Union Telegraph Company. From a judgment for plaintiff, defendant appeals. Judgment affirmed.

Thompson & Barwise, of Ft. Worth, and A. C. Wood, of Houston, for appellant. Williams & Smith and David B. Trammell, all of Ft. Worth, for appellee.

CONNER, C. J. C. W. Piper instituted this suit against the Western Union Telegraph Company for damages alleged to have been caused by negligence in the transmission of a telegram from Ft. Worth, Tex., to Medicine Lodge, Kan. There is but little controversy over the facts. The telegram, as written and delivered for transmission at Ft. Worth, reads as follows:

"Fort Worth, Texas, February 6, 1914.
"C. L. Grigsby, Medicine Lodge, Kansas.
"I can buy load of butcher steers for 5.75 will weigh 730 pounds and make 54 per cent and have good load of red cows weight 730 pounds for 4.85. Wire if you can use either at once. Steers on Mexican order.
"C. W. Piper."

As delivered to Grigsby in Medicine Lodge, it read:

"Fort Worth, Texas, February 6, 1914.
"C. L. Grigsby, Medicine Lodge, Kansas.
"I can buy load of butcher steers for 2.75 will weigh 730 pounds and make 54 per cent and have good load of red cows weight 730 pounds for 4.85. Wire if you can use either at once steers on Mexican order. C. W. Piper."

The delivery was made under the following circumstances as related by Grigsby in his testimony on the trial:

"Mr. Smith, the agent at Medicine Lodge, came into my place of business and says: 'Here is a telegram from Ft. Worth. I will stop as I come back from dinner for the answer'—and went on out, and I read the telegram and discussed the matter over with my brother and my meat cutter, and after Mr. Smith finished his dinner he did come back for the answer, and I says, 'Haven't you made a mistake on this telegram?' and he says, 'No; I have not;' and I says, 'You wire back, and if the figures in this telegram are correct, I am going to buy those steers,' and he says, 'All right, when I get through I will phone you,' which in the course of an hour and a half or two hours he did; that is, he phoned to my brother. There was nothing further done between myself and Smith."

The "brother," D. S. Grigsby, testified that the agent Smith's answer was:

"I have verified that message, and it is correct as I gave it to you."

Thereupon Grigsby wired Piper to:

"Ship steers immediately, wire me when loaded out."

Piper had no knowledge of the change made in his original telegram, and, on receipt of Grigsby's acceptance or direction, shipped the cattle, which were in due course received and appropriated by Grigsby, who paid therefor at the rate of $2.75 per hundred pounds, as specified in the offering telegram to him. He, however, refused to either pay more, or to surrender the cattle on Piper's demand, when the latter first learned of the mistake that had been made in the transmission of his offer.

To the suit predicated upon this state of facts, the defendant company pleaded, among other things, the general denial, and specially, substantially, as follows:

"(a) That the message referred to by appellee was delivered to and accepted by appellant subject to the terms of a certain written contract by the terms of which it was provided that the appellant should not be liable for mistakes or delays in the transmission and delivery or for the nondelivery of any unrepeated message beyond the amount received for sending same, and that the message as filed was an unrepeated message, and that the appellant was not directed or requested to repeat the same, and that all the appellant received for the transmission of said message was the sum of 90 cents, which was the ordinary and reasonable charge for the transmission of an unrepeated message.

"(b) That the message was an interstate message to be sent from a point in the state of Texas to a point in the state of Kansas, and that by the appellant's established rules and regulations, as the same were in effect prior to June 18, 1910, and are still maintained and established, messages are classified, among other classifications, as repeated and unrepeated messages; that in the case of an unrepeated message appellant does not assume liability beyond the amount charged for sending same, while in the case of a repeated message appellant does not limit its liability to the amount charged for the transmission of the message, but assumes liability for an amount not to exceed 50 times the amount charged for sending same. That for the additional work of repeating the message and the additional risk of liability assumed in the case of a repeated message, the appellant at all times mentioned made, and still makes, an ad-

ditional charge, equal to one-half of the unrepeated message rate.

"That by the act of Congress of the United States, approved June 18, 1910, Congress entered and assumed charge of regulating the field of interstate communication by telegraph, and conferred upon the Interstate Commerce Commission full power over the rates, charges, classifications, and practices of the telegraph companies, and that the Interstate Commerce Commission, prior to the time of the filing of this message, had knowledge of the rates, charges, and classifications established by appellant Western Union Telegraph Company, and at no time has it sought to change, modify, or disapprove the right of the appellant to charge different rates, but has recognized the right of appellant to charge a higher rate for a greater liability and a lower rate for a less liability.

"That in addition to the above appellant also pleaded that the message was valued at $50 by the sender, and was delivered to it under a certain contract in writing by the terms of which it was provided that the liability of appellant could in no event exceed the sum of $50; that the message was filed by the sender at a $50 valuation, and the rate charged by appellant of the appellee was based on a $50 valuation. That all of the appellant's ordinary rates and tariffs for the transmission and delivery of messages are based upon the assumption that the message is valued at $50, or less, and that in case of a message filed at a specified sum in excess of $50, it was, at all the times mentioned, and still is, the rule, regulation, tariff, and practice of the appellant to charge and collect an additional sum to cover the increased risk of liability, which additional sum is based upon the valuation of the message, and is equal to one-tenth of 1 per cent. thereof.

"It was also pleaded by appellant with reference to this defense that the act of Congress of the United States, approved June 18, 1910, assumed charge of regulating the field of interstate communication by telegraph, thereby removing and exempting such interstate communication by telegraph from the field of state regulation, and conferred upon the Interstate Commerce Commission full power over the rates as pleaded bp appellant with reference to unrepeated messages, and that the Interstate Commerce Commission had full knowledge of the rates, charges, and classifications as established by the appellant, and with such knowledge approved the same, and recognized the right of the appellant to charge a higher rate for a greater liability and a lower rate for a less liability."

The defendant further pleaded contributory negligence on plaintiff's part and collusion between plaintiff and Grigsby and other matter which we find has no substantial foundation in the evidence, and which, therefore, will not be further noticed.

The court sustained the plaintiff's exceptions to the defendant's said special pleas, and, after the introduction of the evidence, gave a peremptory instruction to the jury to find for the plaintiff in the sum of $662.70, the amount of his uncontroverted actual loss. The jury so returned their verdict, and the defendant has appealed from the judgment entered in the plaintiff's favor for the amount stated.

Appellant's negligence in the premises is beyond dispute, and the vital questions urged go to the sufficiency of the special defensive pleas noted in our statement of the case, and appellant presents them both by assignments of error to the action of the court in sustaining the plaintiff's exceptions thereto

and by assignments of error to the verdict and judgment. But the form of presentation is deemed to be immaterial, inasmuch as evidence in support of the allegations of the special pleas seems to have been admitted under paragraphs of the defendant's answer to which no exceptions were made. The writer and Justice DUNKLIN, Justice BUCK not agreeing, wish to further observe, as an introduction to our main discussion, that a complete answer to appellant's special pleas that its liability was limited on the ground that the message was unrepeated is found in the undisputed fact that Grigsby directed the message in question to be repeated, and that appellant's agent in Kansas undertook to do so.

[1] A repetition of the message at the instance of Grigsby would inure, as said majority think, to the benefit of Piper and otherwise as fully meet the beneficial purposes of the provision, and be as fully operative and effective as if the message had been repeated upon the plaintiff Piper's procurement. See W. U. Tel. Co. v. Landis (Pa.) 12 Atl. 467. Moreover, our ruling on the other special defenses hereinafter discussed will, we all think, substantially apply alike to all of the special defenses named.

We are thus brought to a determination of the main question of whether, under the circumstances of this case, we should sustain appellant's contention that under the operation of the interstate commerce law its liability herein must be limited to $50. The provision mainly relied upon by appellant as constituting an enforceable contract limiting its liability is one, among numerous others, printed upon the reverse side of the telegram written and delivered by Piper, and reads as follows:

"In any event the company shall not be liable for damages for any mistakes or delay in the transmission or delivery, or for the nondelivery, of this day letter, whether caused by the negligence of its servants or otherwise, beyond the sum of fifty dollars, at which amount this day letter is hereby valued, unless a greater value is stated in writing hereon at the time the day letter is offered to the company for transmission, and an additional sum paid or agreed to be paid, based on such value, equal to one-tenth of one per cent. thereof."

Such a provision as against negligence has repeatedly been held to be invalid and unenforceable in this and other states. See W. U. Tel. Co. v. Linn, 87 Tex. 7, 26 S. W. 490, 47 Am. St. Rep. 58; G., C. & S. F. Ry. v. Wilson, 69 Tex. 739, 7 S. W. 653; W. U. Tel. Co. v. Robertson, 59 Tex. Civ. App. 426, 126 S. W. 629; W. U. Tel. Co. v. Norris, 25 Tex. Civ. App. 43, 60 S. W. 982, and authorities there cited. That such conditions or stipulations in so far as they undertake to exempt the company from liability for negligence on the part of servants and employés are void under the rules of decision in this state is too well settled to require discussion. Indeed, it is statutory with us that carriers cannot, by any special regulation or agree-

ment, limit their liability as it existed at common law, which deemed it against public policy to countenance agreements relieving carriers from the natural consequences of their own negligence. But the question is, Can we apply our statute and rules to the provisions of the contract above quoted?

[2] The mere fact that the .Constitution of the United States (section 8, art. 1) commits to Congress the power of regulating commerce among the several states of the Union, and that later, in 1887, Congress passed the Interstate Commerce Act, and provided for the establishment of the Interstate Commerce Commission with supervisory power over the subject, will not alone deprive the several states of the Union of enforcing their own rules and public policy over the subject of interstate commerce when not in conflict with some congressional enactment. Thus it was held, as applied to the subject here under discussion, as early as 1903 by the Supreme Court of the United States (see Pa. Ry. Co. v. Hughes, 191 U. S. 477, 24 Sup. Ct. 132, 48 L. Ed. 268), that the courts of the several states might administer the common law according to their own interpretation without control by our federal courts, unless some right, immunity, or privilege created by the federal power was asserted and shown. That was a case where the owner of a horse shipped him over the lines of several connecting carriers from Albany in the state of New York to Cynwyd in the state of Pennsylvania. The railway company, when sued by the owner for damages to the horse caused by negligence in the transportation, pleaded and proved a provision of the shipping contract limiting the liability of the carrier for loss or damage to the horse to "not exceed one hundred dollars." The state courts of Pennsylvania, where the action originated, denied the validity of such a contract (see Hughes v. Pa. Ry. Co., 202 Pa. 222, 51 Atl. 990, 63 L. R. A. 513, 97 Am. St. Rep. 713), and on appeal to the Supreme Court of the United States it was held that the question was not one over which the federal courts had supervisory power, and that the highest court of Pennsylvania might—

"administer the common law according to its understanding and interpretation of it, being only amenable to review in the Federal Supreme Court where some right, title, immunity, or privilege, the creation of the federal power, has been asserted and denied" (citing Betell v. Demaret, 10 Wall. 537, 19 L. Ed. 1007; Delmas v. Merchants' Mut. Ins. Co., 14 Wall. 666, 20 L. Ed. 759; New York L. Ins. Co. v. Hendren, 92 U. S. 287, 23 L. Ed. 709; United States v. Thompson, 93 U. S. 586, 23 L. Ed. 982).

The same high court in the same case, in answering a contention that the judgment of the Pennsylvania court against the validity of the special contract referred to was in conflict with the act of Congress of February 4, 1887, entitled, "An act to regulate commerce," said:

"In refusing to limit the recovery to the valuation agreed upon, did the state court deny to the company a right or privilege secured by the interstate commerce law? It may be assumed that under the broad power conferred upon Congress over interstate commerce as defined in repeated decisions of this court, it would be lawful for that body to make provision as to contracts for interstate carriage, permitting the carrier to limit its liability to a particular sum in consideration of lower freight rates for transportation. But upon examination of the terms of the law relied upon we fail to find any such provision therein. The sections of the interstate commerce law relied upon by the learned counsel for plaintiff in error (24 Stat. at L. 379–382, chap. 104, U. S. Comp. Stat. 1901, pp. 3154–3159; 25 Stat. at L., 855, c. 382, U. S. Comp. Stat. 1901, p. 3158) provide for equal facilities to shippers for the interchange of traffic; for nondiscrimination in freight rates; for keeping schedules of rates open to public inspection; for posting the same in public places, with certain particulars as to charges, rules, and regulations; for the publication of joint tariff rates for continuous transportation over one or more lines, to be made public when directed by the Interstate Commerce Commission; against advances in joint tariff rates except after ten days' notice to the commission; against reduction of joint tariff rates except after three days' like notice; making it unlawful for any party to a joint tariff to receive or demand a greater or less compensation for the transportation of property between points as to which a joint tariff is made different than is specified in the schedule filed with the Commission; giving remedies for the enforcement of the foregoing provisions, and providing penalties for their violation; making it unlawful to prevent continuous carriage, and providing that no break of bulk, stoppage, or interruption by the carrier, unless made in good faith for some necessary purpose, without intention to evade the act, shall prevent the carriage of freights from being treated as one continuous carriage from the place of shipment to the place of destination.

"While under these provisions it may be said that Congress has made it obligatory to provide proper facilities for interstate carriage of freight, and has prevented carriers from obstructing continuous shipments on interstate lines, we look in vain for any regulation of the matter here in controversy. There is no sanction of agreements of this character limiting liability to stipulated valuations, and, until Congress shall legislate upon it, is there any valid objection to the state enforcing its own regulations upon the subject, although it may to this extent indirectly affect interstate commerce contracts of carriage?"

The court then reviews a number of its own decisions closely in point, and concludes as follows:

"We can see no difference in the application of the principle based upon the manner in which the state requires this degree of care and responsibility, whether enacted into a statute or resulting from the rules of law enforced in the state courts. The state has a right to promote the welfare and safety of those within its jurisdiction by requiring common carriers to be responsible to the full measure of the loss resulting from their negligence, a contract to the contrary notwithstanding. This requirement in the case just cited is held not to be an unlawful attempt to regulate interstate commerce, in the absence of congressional action providing a different measure of liability when contracts such as the one now before us are made in relation to interstate carriage. Its pertinence to the case under consideration renders further discussion unnecessary. The judgment of the Supreme Court of Pennsylvania is affirmed."

An examination of the cases, which are too numerous to now notice, will disclose that the views expressed in the Hughes Case above as to the effect of the Interstate Commerce Act upon limitations of liability in contracts for interstate shipments were followed and applied by the Supreme Court of the United States until the passage by Congress of the act of June 29, 1906, frequently referred to as the Carmack Amendment. This act amends the act of February 4, 1887, and enlarges the number of persons and companies made subject to the interstate commerce laws (including express companies), and, among other things, not necessary to particularize, specially provides in one of the paragraphs of section 1, that:

"All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, shall be just and reasonable; and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful."

It is further enacted in section 6 of the amendment:

"That every common carrier subject to the provisions of this act shall file with the Commission created by this act and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established. If no joint rate over the through route has been established, the several carriers in such through route shall file, print and keep open to public inspection as aforesaid, the separately established rates, fares and charges applied to the through transportation. The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. The provisions of this section shall apply to all traffic, transportation, and facilities defined in this act."

See U. S. Comp. Stat. 1901, Supplement 1907, p. 895.

After this amendatory act, a change took place in the course of the decisions of the federal courts which construed section 6 just quoted as evincing the purpose of Congress to assume control of the subject of the liability of carriers under contracts for interstate shipments, and to supersede all state

regulations having reference to those subjects. As clear a presentation of such construction and of the consequent change in the attitude of the court, and of the reason therefor, as can be found perhaps is in the recent case of the Adams Express Co. v. Croninger, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257.

That was a case where the plaintiff in the suit delivered to the express company at a point in the state of Ohio a small package, containing a diamond ring for shipment to a point in the state of Georgia. The ring was never delivered, and in the suit instituted to recover its value, the express company pleaded, in substance, as follows:

"That the defendant was an express company engaged in interstate commerce within the provisions of the act of Congress of June 29, 1906 (34 Stat. at L. 584, c. 3591, U. S. Comp. Stat. Supp. 1911, p. 1288); that in obedience to that act it had duly filed with the Interstate Commerce Commission schedules showing its rates and charges from Cincinnati to Augusta, Ga., which schedules showed that its rates and charges, when the value of the property to be carried was in excess of $50, were graduated reasonably, according to the value, and that the lawful rate upon the package of the plaintiff from Cincinnati to Augusta was 25 cents if the value was $50 or less, and was 55 cents if its value was $125.

"It is averred that the plaintiff knew that the charges upon the package shipped were based upon the value of the shipment, and that it [the defendant] required that the value should be declared by the shipper, and that if he did not disclose and declare the value when he delivered the shipment to it at Cincinnati for transportation to Augusta, the rate charged would be based upon a valuation of $50. It is then alleged that the package so delivered was sealed, and that defendant did not know the contents or value, and that if it had, it would not have received it for carriage for less than the lawful published rate of 55 cents. The receipt or bill of lading issued shows no value, but contains a stipulation in these words: 'In consideration of the rate charged for carrying said property, which is regulated by the value thereof, and is based upon a valuation of not exceeding $50 unless a greater value is declared, the shipper agrees that the value of said property is not more than $50, unless a greater value is stated herein, and that the company shall not be liable in any event for more than the value so stated, nor for more than $50 if no value is stated herein.' "

The Kentucky courts, on the ground of its invalidity under Kentucky laws, refused to give effect to the contract, limiting the liability of the express company as pleaded by it, and gave the plaintiff judgment for $137.-50, being the full value of the ring. On writ of error to the Supreme Court of the United States, however, that court upheld the sufficiency of the defenses on the ground that the common law, as had been construed in that court and in the courts of a number of the states, did not forbid reasonable contracts fixing the liability of the carrier in a given ratio to rates charged, and that such construction of the common law would now be followed in the federal court to the exclusion of all state regulations to the contrary, in view of the provisions of said section 6 hereinabove quoted. The decision is

clear, replete with citation of and quotation from decisions, and to the extent of its scope is unquestionably supreme. It certainly superseded, as to all persons, companies, and corporations subject to the act, all state regulations materially affecting the liability of carriers under contracts for interstate shipments.

It must be noted, however, that the Croninger Case, and other cases of like effect cited therein, all have reference to contracts evidenced by bills of lading, receipts, etc., given by railway, express, and other companies, for specific property delivered for transportation. No act prior to 1910, to be hereinafter more particularly noticed, had classified telegraph companies as common carriers. Hence it was that the rule of construction adopted in the Croninger Case was not applied to contracts for the transmission of telegraphic messages between points in different states. See Ivy v. W. U. Tel. Co. (C. C.) 165 Fed. 371 (reversed on other grounds in 177 Fed. 63, 100 C. C. A. 481); Telegraph Co. v. Crovo, 220 U. S. 364, 31 Sup. Ct. 399, 55 L. Ed. 498; Telegraph Co. v. James, 162 U. S. 650, 16 Sup. Ct. 934, 40 L. Ed. 1105. These cases as to contracts for telegraphic messages between states apply the rules announced in Railway Co. v. Hughes, supra, and other cases decided prior to the law of 1910, and recognize the laws of the states relating to the subject.

On the 18th day of June, 1910, however, Congress again amended the interstate commerce laws so as to classify, among others, telegraph companies as common carriers subject to the interstate commerce laws. We insert so much of this amendment as has reference to the case before us, to wit:

"The provisions of this act shall apply * * * to telegraph, telephone, and cable companies (whether wire or wireless) engaged in sending messages from one state, territory, or district of the United States, to any other state, territory, or district of the United States, or to any foreign country, who shall be considered and held to be common carriers within the meaning and purpose of this act. * * * All charges made for any service rendered or to be rendered in the transportation of passengers or property and for the transmission of messages by telegraph, telephone, or cable, as aforesaid, or in connection therewith, shall be just and reasonable; and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful: Provided, that messages by telegraph, telephone, or cable, subject to the provisions of this act, may be classified into day, night, repeated, unrepeated, letter, commercial, press, government, and such other classes as are just and reasonable, and different rates may be charged for the different classes of messages. * * *" U. S. Comp. St. 1913, § 8563.

After the foregoing amendment, the Supreme Court of the United States was called upon to pass upon the validity of a state regulation relating to a contract for the transmission of an interstate message. We refer to the case of W. U. Tel. Co. v. Brown, 234 U. S. 542, 34 Sup. Ct. 955, 58 L. Ed. 1457.

In that case it appears that a death message delivered to the telegraph company in South Carolina and addressed to Brown in Washington, D. C., was duly transmitted, but never delivered. Brown in the South Carolina courts recovered a judgment for a penalty authorized by a statute of that state for the negligent failure to deliver the message. But on writ of error, the United States Supreme Court held, in the case cited, that the judgment of the state courts was erroneous. This decision is urgently relied upon as supporting appellant's plea of limited liability in the case now before us, and it has been so interpreted in several state decisions to which our attention has been directed. Thus, in the case of W. U. Tel. Co. v. Compton, 114 Ark. 193, 169 S. W. 946, the Supreme Court of Arkansas finally construed and gave effect to a limited liability clause of a contract for the transmission of a message from a point in Arkansas to a point in Oklahoma. The limiting clause is not set out in the opinion, but we infer that it was similar to, if not identical with, the limiting liability clause pleaded and proven in the case now before us, and the above case of Telegraph Company v. Brown was made the basis of the ruling. To the same effect are the later cases of W. U. Tel. Co. v. Johnson, 115 Ark. 564, 171 S. W. 859, and W. U. Tel. Co. v. Holder, 117 Ark. 210, 174 S. W. 552, in both of which the Supreme Court of Arkansas followed its earlier decision in the Compton Case. In Virginia, also, the Brown Case is construed as deciding that the act of 1910 had the effect of superseding all state regulations relating to the liability of telegraph companies under contracts for interstate business. See W. U. Tel. Co. v. Bilisoly, 116 Va. 562, 82 S. E. 91; W. U. Tel. Co. v. Bank, 116 Va. 1009, 83 S. E. 424. The Supreme Court of Oklahoma, in a very forceful opinion, also reached the conclusion announced by the above state cases (see W. U. Tel. Co. v. Bank [Okl.] 156 Pac. 1175), and we have been furnished in pamphlet form with a copy of a late opinion of like import by the Supreme Court of Alabama in the case of W. U. Tel. Co. v. Hawkins, 73 South. 973. We also find intimations of like tendency in one of our own cases, though the question was not definitely decided. See W. U. Tel. Co. v. Smith, 188 S. W. 702.

All of the foregoing decisions from Arkansas, Virginia, Oklahoma, and Alabama rest essentially on said act of June, 1910, and the decision in the case of W. U. Tel. Co. v. Brown, supra, and if we must follow them it would seem to be our duty to reverse the judgment in this case and uphold appellant's said special defenses. But we conceive it to be our duty to follow our statute, decisions, and public policy relating to the subject until impelled to do otherwise by some clear, controlling, authority, and we have concluded that thus far we have been furnished with no authority which under the particular circumstances of this case require us to depart from the well-settled course of our own decisions. In the first place we have two carefully considered opinions by our Court of Civil Appeals for the Sixth Supreme Judicial District, in which that court had occasion to determine the precise question involved in the case now before us, and in which a conclusion was reached directly opposed to the decisions cited by us from other states. See W. U. Tel. Co. v. Bailey, 171 S. W. 839; Id., 184 S. W. 519. Mr. Associate Justice Hodges, who wrote the several opinions referred to, clearly and convincingly, as it seems to us, points out that the decision in the Brown Case was based on the proposition that the statute of South Carolina, imposing a penalty for negligence in failing to deliver a telegram, would not extraterritorially affect the liability of the telegraph company for negligence committed in the District of Columbia, where no such penalty had been provided. It seems clear that the Supreme Court of the United States treated the case as one of tort, and not in an aspect of a contract breached. Indeed, that court expressly designated the case as one of tort, and hence applied thereto a law controlling torts, to wit, that the consequence of a tort must be determined by the laws of the place where it was committed. See Huntington v. Attrill, 146 U. S. 657, 13 Sup. Ct. 224, 36 L. Ed. 1123. It is true in conclusion the court saw proper to say:

"What we have said is enough to dispose of the case. But the act also is objectionable in its aspect of an attempt to regulate commerce among the states. That is, as construed, it attempts to determine the conduct required of the telegraph company in transmitting a message from one state to another or to this District by determining the consequences of not pursuing such conduct, and in that way encounters Western U. Teleg. Co. v. Pendleton, 122 U. S. 347, 7 Sup. Ct. 1126, 30 L. Ed. 1187, 1 Interst. Com. Rep. 306, a decision in no way qualified by Western U. Teleg. Co. v. Commercial Mill Co., 218 U. S. 406, 31 Sup. Ct. 59, 54 L. Ed. 1088, 36 L. R. A. (N. S.) 220, 21 Ann. Cas. 815."

But this, as was pointed out by Justice Hodges, evidently was not intended as a construction of section 6 of the Carmack Amendment, or of the amendment of 1910, classifying telegraph companies as common carriers. For, as the basis of these observations, reference is made to the case of W. U. Tel. Co. v. Pendleton, 122 U. S. 347, 7 Sup. Ct. 1126, 30 L. Ed. 1187, which was decided long before either of the amendments referred to, and which merely held, in line with decisions theretofore rendered, that a penal statute of the state of Indiana attempting to regulate the mode of delivery of telegrams in other states was void as imposing a burden on interstate commerce. So that we do not feel impelled to adopt the reasoning of the opinions from other jurisdictions and hold that the decision in W. U. Tel. Co. v.

Brown is conclusive in appellant's favor here.

[3] There yet remains, however, the necessity of determining the proper effect to be given to the acts of 1906 and 1910. It is the contention of appellant, as well as the reasoning of some of the cases, that independent of the Brown decision, the acts referred to evince the intention of Congress to assume control of the subject of the liability of telegraph companies under a contract for the transmission of a telegram between points in different states or territories, and that, therefore, all power over the subject on the part of the separate states has been superseded. If the premise of the proposition is correct, the conclusion is unanswerable. For its is too well settled to require the citation of authority that, where Congress once assumes control over a subject or territory committed to it by the Constitution of the United States, all power of the separate states over such subject is at an end. But we do not think it is clear that Congress, by the acts mentioned, intended to depart from the previous course of decision on the part of its own courts, and to assume control, to the exclusion of the states, of the particular subjects of the form and effect of telegraphic contracts and of the liabilities arising thereunder. The court in the Croninger Case, from which we have already quoted, in deciding that Congress had assumed control of the contracts and liabilities springing therefrom in interstate commerce cases, based its conclusion on that part of the act of 1906 providing, substantially, as follows:

"First. It affirmatively requires the initial carrier to issue 'a receipt or bill of lading therefor,' when it receives 'property for transportation from a point in one state to a point in another.'

"Second. Such initial carrier is made 'liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it.'

"Third. It is also made liable for any loss, damage, or injury to such property caused by 'any common carrier, railroad, or transportation company to which such property may be delivered, or over whose line or lines such property may pass.'

"Fourth. It affirmatively declares that 'no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed.'"

It is evident, as it seems to us, that Congress, at the time of this enactment, did not have in mind any kind of control over the rates, contracts, or liabilities of telegraph companies, for at that time such companies had not been classified as among persons, corporations or companies, theretofore made subject to interstate commerce laws. In verification of this, if verification be needed, we have but to refer to the decisions of the Supreme Court of the United States already adverted to, distinctly holding, in effect, that until the act of 1910, Congress had not attempted control over telegraph companies, and that hence the laws and regulations of the states were effective in determining the validity of the contracts in interstate commerce cases. Moreover, it seems manifest that the regulations of the act of 1906, relating to the contracts and liabilities of interstate carriers, and upon which the Croninger decision is based, have no appropriate application to the business or procedure of telegraph companies. The act of 1906 in question contemplates, as we have before suggested, an actual delivery of tangible property for which the carrier is required to issue a bill of lading or receipt, which is the basis of the contract of shipment. Such was the character of contract considered in the Croninger Case, and it is for such property so delivered that the act designates the liabilities imposed. Such regulations clearly were intended to apply to carriers of property, such as railway, express companies, etc., and not to persons or companies forwarding over wires as intangible a thing as a message —a thing without specific property or value. As said by the Supreme Court of the United States in the case of W. U. Tel. Co. v. Pendleton, 122 U. S. 347, 7 Sup. Ct. 1126, 30 L. Ed. 1187:

"Although intercourse by telegraphic messages between the states is thus held to be interstate commerce, it differs in material particulars from that portion of commerce with foreign countries and between the states which consists in the carriage of persons and the transportation and exchange of commodities, upon which we have been so often called to pass. It differs, not only in the subjects which it transmits, but in the means of transmission. Other commerce deals only with persons, or with visible and tangible things. But the telegraph transports nothing visible and tangible; it carries only ideas, wishes, orders, and intelligence. Other commerce requires the constant attention and supervision of the carrier for the safety of the persons and property carried. The message of the telegraph passes at once beyond the control of the sender, and reaches the office to which it is sent instantaneously. It is plain, from these essentially different characteristics, that the regulations suitable for one of these kinds of commerce would be entirely inapplicable to the other."

[4] In view of what has thus been stated, it can hardly be said to be clear that Congress, by the enactment of the act of 1910, intended to subject telegraph companies to the operation of the wholly inapplicable regulations originally designed for the government of an altogether different character of carrier. The law of 1910, as will be seen by a reference to it, as hereinbefore quoted, and in so far as herein pertinent, merely impresses upon telegraph companies the character of a common carrier; provides that their charges shall be "just and reasonable"; declares that unjust and unreasonable charges shall be unlawful; and specially provides that messages may be classified as in the act directed, and that "different rates may be charged for the different classes of messages." No reference whatever is made to the subject of the contract for the transmission of the message or of the liability for the breach of such contract. Had Congress intended to assume control over these sub-

jects, it would seem to have been easy to have so declared, or to have provided appropriate regulations having such effect, as was done in the case of carriers of property. As Mr. Justice Hodges in the opinion in the Bailey Case, as printed in the 171 S. W. 842, so pertinently and forcefully says, after reviewing the act of 1910:

"It appears from these extracts that the extent to which Congress has gone is merely to declare that telegraph companies shall be considered common carriers, and to require them to make and observe reasonable rates and charges for the services which they perform, and to permit them to divide their messages into classes, presumably as a basis for rates. The mere fact that Congress has enacted some legislation on this subject does not, of itself, signify a purpose to monopolize the field and exclude the states entirely. M., K. & T. Ry. Co. v. Harris, 234 U. S. 412, 34 Sup. Ct. 790, 58 L. Ed. 1377, L. R. A. 1915E, 942; Atl. C. L. Ry. Co. v. State of Georgia, 234 U. S. 280, 34 Sup. Ct. 829, 58 L. Ed. 1312."

[5] It, of course, is not to be implied from what we have said that the act of 1910 did not have the effect to subject telegraph companies to regulations of Congress that could be appropriately applied to such companies and to the character of business transacted by them. On the contrary, all such regulations, and all acts of Congress then, or theretofore, enacted as could be so applied undoubtedly must be given controlling effect. Such as provisions requiring rates and regulations to be reasonable; requiring their rates and regulations to be filed with the Interstate Commerce Commission; forbidding unlawful preferences and discriminations; and imposing liability for the penalties declared for a violation of such provisions. The point we are endeavoring to make is that the act of 1910 ought not to be interpreted as manifesting an intent to assume control outside of and beyond the subject treated by Congress in regulations that can be fairly applied to telegraph companies and the character of transportation done by them. To do so is to impute to the Congress an oversight, or an inability to select unambiguous words to declare its purpose, and thus to leave as a heritage to the courts all the confusion and uncertainty involved in attempts to enforce regulations having but little, if any, application to the subject. Said Justice Harlan in Reid v. Colorado, 187 U. S. 137, 23 Sup. Ct. 92, 47 L. Ed. 108:

"It should never be held that Congress intends to supersede or by its legislation suspend the exercise of the police powers of the states, even when it may do so, unless its purpose to effect that result is clearly manifested. This court has said—and the principle has been often reaffirmed—that, 'in the application of this principle of supremacy of an act of Congress in a case where the state law is but the exercise of a reserve power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together.'"

We have, accordingly, concluded that we should follow the decision of the Court of Civil Appeals for the Sixth District rather than the authorities from other states.

[6] But if at fault in the foregoing reasoning, there are several features of the case before us that do not appear in any of the opinions upon which appellant relies that, as it seems to us, lead to the same general conclusion. While it is urged that, prior to the time of sending the message in question, the Interstate Commerce Commission "had knowledge of the rates, charges, and classifications established by appellant, Western Union Telegraph Company, and at no time sought to change, modify or disprove the right of the appellant to charge different rates, but has recognized the right of appellant to charge a higher rate for a greater liability, and a lower rate for a less liability," it was not so proven. The Interstate Commerce Commission, as has often been held, has no original power to fix rates, although it may modify, equalize, or correct them upon complaint. No act of approval or circumstances tending to show the knowledge imputed was alleged or proven. It particularly is neither alleged nor proven that appellant filed its rates and regulations with the Interstate Commerce Commission and cause them to be published and posted as required by the interstate commerce law. As will be seen by reference to section 6 of the act of 1906 hereinbefore quoted, it is thereby and plainly provided that:

"Every common carrier subject to the provisions of this act shall file with the Commission * * * and print and keep open to public inspection schedules showing all the rates, fares, and charges. * * * The schedules printed as aforesaid by any * * * common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed *and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered,*" etc. (Italics ours.)

That these provisions as applied to telegraph companies are within the reason and spirit of the law, and manifestly controlling, seems plain. It also seems plain that the regulations under which appellant claims its limited liability are within the operation of the terms of the act that we have italicized. Ames v. Union Pacific Ry. (C. C.) 64 Fed. 165; Railway v. Hooker, 233 U. S. 97, 34 Sup. Ct. 526, 58 L. Ed. 1141. Should it therefore be said that appellant is to be indulged in its assertion of the validity and binding force of a rate or regulation under the interstate commerce law, when it has not complied with the plain requirement of such law by filing its said rates and regulations with the Interstate Commerce Commission? Can it be said, in the absence of such filing, that the rate or regulation is an approved one? It does not so seem to us. It has been

held that the posting of rates, etc., as required by the act, is not necessary to their binding force, but it was said:

"The filing of the schedule with the Commission and the furnishing by the railroad company of copies to its freight offices incontrovertibly evidenced that the tariff of rates contained in the schedule had been established and put in force as mentioned in the first sentence of the section, and the railroad company could not have been heard to assert to the contrary." T. & P. Ry. Co. v. Cisco Oil Mill, 204 U. S. 449, 27 Sup. Ct. 358, 51 L. Ed. 562.

Other cases of like effect may be found, and we think it may be safely said that no rate or regulation of an interstate carrier can be said to have been established or approved under the Interstate Commerce Acts until it shall, at least, have been published and filed with the Interstate Commerce Commission. It so appeared in T. & P. Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075, in Adams Express Company v. Croninger, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257, in Boston & M. R. Co. v. Hooker, 233 U. S. 97, 34 Sup. Ct. 526, 58 L. Ed. 868, L. R. A. 1915B, 450, Ann. Cas. 1915D, 593, in T. & P. Ry. Co. v. Mugg, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011, and in other cases examined by us, where a tariff or regulation of an interstate carrier was upheld as against a state statute or rule of contrary effect. In the case of Atlanta, K. & N. Ry. Co. v. Horne, 106 Tenn. 73, 59 S. W. 134, it appears that Horne sought to recover certain freight consigned to him upon payment of the rate charged therefor, as specified in the bill of lading issued by the initial carrier. The shipment was an interstate one, and the terminal carrier resisted delivery on the ground that under its schedule it was entitled to a higher rate. The Supreme Court of Tennessee held that the higher rate was ineffective because it had not been shown that any character of publication thereof had been made, as required by the interstate commerce law. We have been unable to find that the Supreme Court of the United States has ever passed upon this case, or to otherwise test its value as an authority. It is possibly to be inferred that the "publication" in mind of the Tennessee court was a publication other than that of merely posting the railway schedules in its stations, etc., else the decision would seem to be in opposition to the decision of the Supreme Court in the case of Railway Co. v. Cisco Oil Mill, supra. But, however this is, we refer to the case as at least illustrative of the thought of a court of high dignity.

It has been the ruling of our own courts, as well as of others, than when one writes a message on a blank form furnished by a telegraph company, he is effected with notice of conditions printed upon the form. W. U. Tel. Co. v. Edsall, 63 Tex. 668. But it is a matter of common knowledge that such forms are generally furnished in pads glued together, with the conditions in fine print on the reverse or hidden side. It is not venturing too far to say that but few persons in the general haste of sending a telegram stop to read the printed terms on the back of the form furnished. Is it then unreasonable to suppose that Congress, in so carefully and explicitly providing that interstate carriers should publish and post in conspicuous places the rates and regulations, intended that the shipper or forwarder should have an open notice of all such rates or regulations in addition to that implied by law from the mere fact of signing the bill of lading or telegram?

[7] It seems to us that this is a reasonable construction, and that it has an appropriate application here. There is no proof whatever that Piper, for the purpose of obtaining a lower rate for the transmission of the telegram, contracted that the liability of the telegraph company should be limited to any sum less than an actual loss proximately caused by negligence in its delivery. Nor is there any proof whatever that Piper had any actual knowledge of the printed limitation of liability upon which appellant relies, or that his attention was called thereto even in an indirect way, and we may safely assume that he knew nothing of them. The construction referred to is indicated, we think, in several of the cases. In the Croninger Case, from which we have already quoted, it was said:

"The knowledge of the shipper that the rate was based upon the value is to be presumed from the terms of the bill of lading and of the published schedules filed with the Commission."

The case of Boston & M. R. Co. v. Hooker, 233 U. S. 97, 34 Sup. Ct. 526, 58 L. Ed. 868, L. R. A. 1915B, 450, Ann. Cas. 1915D, 593, was one in which a passenger sued for the full value of certain lost baggage, notwithstanding a limitation of such liability to a declared value contained in the carrier's published tariffs. The tariff charged and paid by the passenger corresponded to the limitation of value specified in its tariff rates, and the company was without knowledge of the actual value as found in the suit. The court in upholding the limitation, among other things, said:

"The knowledge of the shipper that the rate was based upon the value is to be presumed from the terms of the bill of lading and of the published schedules filed with the Commission."

So, in K. C. So. Ry. Co. v. Carl, 227 U. S. 639, 33 Sup. Ct. 391, 57 L. Ed. 688, the same court said:

"The valuation the shipper declared determines the legal rate where there are two rates based upon valuation. He must take notice of the rate applicable, and actual want of knowledge is no excuse. *The rate, when made out and filed* (italics ours), is notice, and its effect is not lost, although it is not actually posted in the stations."

And in M., K. & T. Ry. Co. v. Harriman, 227 U. S. 657, 33 Sup. Ct. 397, 57 L. Ed. 697, the same court said:

That the shipper was "compelled to take notice" of the rate sheets contained in tariff

schedules, "not only because referred to in the contract signed by him, but because they had been lawfully filed and published. When the carrier graduates its rates by value, and has filed its tariffs showing two rates applicable to a particular commodity or class of articles, based upon a difference in valuation, the shipper must take notice, for the valuation automatically determines which of the rates is the lawful rate."

In none of the cases, so far as we recall, has the Supreme Court, in opposition to a state rule of decision or statute, upheld a limited liability clause in favor of a carrier subject to the provisions of the Interstate Commerce Acts, where, as here, no actual agreement thereto is shown and no actual knowledge of the terms of the limitation has been brought home to the forwarder, and where the rates and regulations of the carrier, including the limitation, have in fact not been published and filed with the Interstate Commerce Commission, as required by the acts of Congress.

[8] We have, perhaps, already extended this opinion beyond proper limits, but the questions involved seem to be very important, and we will therefore venture to further add that, while expressions can be found to the contrary, the decisions of the Supreme Court of the United States, as well as of our own and sister states, generally uphold the common-law doctrine that a carrier will not be permitted to relieve himself from the consequences of negligence on his part, or on the part of his servants or employés. York Mfg. Co. v. Ill. Cen. R. Co., 3 Wall. 107, 18 L. Ed. 170; N. Y. C. R. Co. v. Lockwood, 17 Wall. 357, 21 L. Ed. 627; Bank of Kentucky v. Adams Express Co., 93 U. S. 174, 23 L. Ed. 872; Hart v. Pa. Ry. Co., 112 U. S. 331, 5 Sup. Ct. 151, 28 L. Ed. 717; Adams Express Co. v. Croninger, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257. The theory of the decisions of the federal courts upholding the right of a carrier to limit its liability in certain cases is based upon the doctrine of estoppel, and not upon any supposed right to contract against its own negligence. They proceed upon the theory that, if the shipper, in order to receive the benefit of a lower rate for the transportation, either fails to disclose the value of the property transported, or deliberately agrees to a value less than its actual value, it would be inequitable and unjust to permit him to thus take advantage of the lower rate and relieve himself of the consequences in case of loss. It is held that such contracts are not agreements to relieve the carrier from the consequences of his negligence, but agreements in effect to proportion the care that shall be exercised by him to the rate or compensation paid for it. The theory is thus stated in the Croninger Case, supra:

"The limitation as to value has no tendency to exempt from liability for negligence. It does not induce want of care. It exacts from the carrier the measure of care due to the value agreed on. The carrier is bound to respond in that value for negligence. The compensation for carriage is based on that value. The shipper is estopped from saying that the value is greater. The articles have no greater value, for the purposes of the contract of transportation, between the parties to that contract. The carrier must respond for negligence up to that value. It is just and reasonable that such a contract, fairly entered into, and where there is no deceit practised on the shipper, should be upheld. There is no violation of public policy. On the contrary, it would be unjust and unreasonable, and would be repugnant to the soundest principles of fair dealing and of the freedom of contracting, and thus in conflict with public policy, if a shipper should be allowed to reap the benefit of the contract if there is no loss, and to repudiate it in case of loss."

As has been already stated, the sender of the telegram in this case made no specific agreement limiting the liability of the telegraph company for the purpose of obtaining a lower charge. He was without actual knowledge of the alleged agreement, so far as appears in the evidence, and did not have that notice of it which, as we think, the law contemplates. There is therefore not an element of estoppel in the case. The basic principle of estoppel is that the one who urges it has been deceived; that the material facts affecting the action were not known. Under such circumstances the courts recognize the natural equity that his acts should be judged in the light of the facts known to him at the time. In the case before us, the telegraph company delivered to Piper no bill of lading or receipt such as is contemplated by section 6 of the act of 1906, nor did Piper deliver anything of specific value to the telegraph company. He delivered a simple message to be transmitted, the meaning of which was as apparent to the telegraph company as to the sender, and it is certainly difficult to see why the consequences of a failure to exercise due care in its transmission was not easily within the contemplation of the telegraph company. It could have but known, as it seems to us, that a mistake of the character shown in this case would necessarily result in a loss to the plaintiff of a greater sum than that to which it now seeks to have its liability limited.

Appellant presents several other questions going to the defense of contributory negligence on the part of the plaintiff, and of collusion between him and Grigsby, and to the failure of the court to submit for the jury's determination the amount of the damages, etc. But inasmuch as all of the facts seem to have been admitted and considered, irrespective of the court's ruling upon the demurrers, and inasmuch as we find no reasonable basis in the evidence to establish such defenses, and in view of the further fact that the amount of plaintiff's loss seems to be undisputed, we will not discuss those assignments. Particularly, as we have received the impression that appellant is not so much seeking a reversal of the judgment upon some technical ground as to have the

case determined upon the vital questions presented, which we have discussed at length. We accordingly conclude that, on the whole, all of appellant's assignments of error should be overruled, and the judgment affirmed.

Affirmed.